2020 IL App (1st) 161067

THIRD DIVISION
June 3, 2020

No. 1-16-1067

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 00 CR 1137 |
| | ) | |
| AHMAD SIMMS, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court, with opinion.
Justice Cobbs concurred in the judgment and opinion.
Presiding Justice Ellis dissented, with opinion.

OPINION

¶ 1    Defendant Ahmad Simms[1] appeals from the denial of his *pro se* motion for leave to file a successive postconviction petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)). He argues he should be permitted leave to file a successive petition because he presented an actual innocence claim based on newly discovered evidence. For the following reasons, we affirm.

¶ 2                                 I. BACKGROUND

¶ 3    On November 27, 1999, the body of Susie Irving was discovered inside her apartment on the 7000 block of South Michigan Avenue. Dr. Thamrong Chira, Cook County deputy medical examiner, testified, as an expert in forensic pathology, that he performed an autopsy on Irving

---

[1]We note that defendant also goes by the name Ahmad Sims, as in *People v. Sims*, 349 Ill. App. 3d 1037 (2004) (table) (unpublished order under Illinois Supreme Court Rule 23).

and found the cause of death to be a single, contact gunshot wound above her right forehead. Dr. Chira recovered a bullet from Irving's head and determined the manner of death to be homicide.

¶ 4    In January 2000, defendant, along with codefendants, Lino Niles and Curtis King, were charged, by indictment, with five counts of first degree murder, six counts of home invasion, and one count each of armed robbery, residential burglary, and possession of burglary tools. Prior to trial, the State nol-prossed the residential burglary and possession of burglary tools charges. Defendant and Niles were tried in separate but simultaneous jury trials. Defendant was convicted of first degree murder, armed robbery, and home invasion. He was sentenced to a total of 60 years' imprisonment: a 45-year term for first degree murder and two concurrent 15-year terms for armed robbery and home invasion to be served consecutively to his murder sentence. We affirmed on direct appeal. *People v. Sims*, 349 Ill. App. 3d 1037 (2004) (table) (unpublished order under Illinois Supreme Court Rule 23).

¶ 5    Prior to trial, defendant filed a motion to suppress evidence, claiming that his statements to the police were involuntarily made. The trial court denied the motion, finding that defendant was advised of his rights and there was no credible evidence that the police violated his constitutional rights.

¶ 6    Because defendant presents a claim of actual innocence based on an affidavit from Niles purporting to state that defendant was not involved in the crime, we will, at the appropriate time, recount in detail the evidence of defendant's involvement in the offense presented at his jury trial. At this juncture we provide an overview of the events that led to Irving's death.

¶ 7    At trial, the State's theory of the case was that defendant was guilty of the murder by accountability. According to the State's theory of the case, defendant, Niles, and King planned to burglarize Irving's apartment. In the afternoon of November 27, 1999, defendant, Niles, and

King forced their way into Irving's apartment and shot and killed her. They then removed various items from the house, including a video cassette recorder (VCR), a coin collection, a small baseball bat, a small television, a maroon attaché case, a small briefcase containing some coins, a Christian Brothers brandy bottle containing coins, and a comforter. They later sold some of the items at an auto shop nearby and left some of the items in the garbage behind the same auto shop. Many of these items were recovered by police during their investigation, and the items were identified as belonging to Irving. Defendant also admitted to law enforcement, via a written statement and a videotaped statement, that he assisted Niles in breaking into and robbing Irving's apartment but claimed that Niles was the shooter.

¶ 8      Evelyn Parks testified that on November 27, 1999, she lived with her 84-year-old sister, Susie Irving, in an apartment on the 7000 block of South Michigan Avenue in Chicago. On that day, Parks left the apartment between 11:30 a.m. and noon. When she returned home about 6 p.m., she learned that the apartment had been broken into and Irving had been killed via a gunshot wound to the head. Items missing from the apartment included a VCR, a coin collection, a small baseball bat, a small television, a maroon attaché case, a small briefcase containing some coins, a Christian Brothers brandy bottle containing coins, and a comforter.

¶ 9      Anthony Hawkins, the nephew of Parks and Irving, testified that he lived in the apartment above them. He left the building that day about 10:45 a.m. He returned to the apartment about 2 p.m. with his daughter, niece, and nephew, and he saw that the basement door latch was broken. His niece saw Irving lying on the floor in the apartment. Hawkins saw blood on her head and noticed that her walker had been tipped over. He then called 911. He also testified that there was some damage to his own apartment door.

¶ 10    Chicago police detective Michael Baker testified that he investigated Irving's murder. About 3:15 p.m. on November 27, 1999, he was directed to Irving's address. Upon approaching the apartment, he noticed some damage to the door. He then saw Irving's body on the floor and observed that the apartment was in disarray. He also later observed damage to the basement door, the second-floor door, and the exterior door to the basement.

¶ 11    About 10:45 p.m. that day, Baker received an anonymous phone call that led him to search a dumpster and garbage cans on the property of J&B Auto Repair, located just two buildings away from Irving's apartment building. Inside the dumpster, Baker found a purple attaché case, a vinyl case, and a broken Christian Brothers brandy bottle with coins in it. He also found a comforter and a small baseball bat inside a garbage can. Photographs of these items were later shown to Parks, who identified them as being taken from her apartment.

¶ 12    Chicago police forensic investigator Thomas Ginnelly testified that he was assigned to the crime scene at Irving's apartment building. During a search of the living room for firearms evidence, he located a cartridge case underneath a couch cushion. The case was from a .25-caliber gun.

¶ 13    The jury found defendant guilty of first degree murder, armed robbery, and home invasion. Defendant moved for a new trial, which the trial court denied. The court then sentenced him to a 45-year term for first degree murder and two concurrent 15-year terms for armed robbery and home invasion to be served consecutively to his murder sentence.

¶ 14    Defendant filed a direct appeal, arguing that the trial court erred in denying him his right to confront and cross-examine a witness at trial regarding the witness's bias or motive for testifying. This court affirmed his conviction and sentence and directed his mittimus to be corrected. *Sims*, 349 Ill. App. 3d 1037.

¶ 15    On July 8, 2005, defendant filed a postconviction petition under the Act, which raised several claims. The trial court determined that the petition was frivolous and patently without merit and summarily dismissed his petition on August 15, 2005. On appeal, this court affirmed that order, after granting appointed counsel's motion for leave to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987). *People v. Simms*, No. 1-05-3100 (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 16    On September 29, 2011, defendant filed a *pro se* petition for *habeas corpus* relief. The trial court denied defendant's petition on October 6, 2011. This court affirmed, after granting appointed counsel's motion for leave to withdraw pursuant to *Finley*. *People v. Simms*, No. 1-11-3528 (2012) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 17    On April 19, 2013, defendant filed a *pro se* motion for leave to file a successive postconviction petition, along with an affidavit from Niles. We discuss Niles's affidavit in detail below. In the motion, defendant raised numerous claims, including that (1) law enforcement officers had no legal basis to arrest him, (2) his confession was involuntary, (3) his constitutional rights were violated when the State unlawfully amended his indictment, (4) he was denied his right to a fair trial, (5) he was denied effective assistance of counsel, and (6) the trial court prevented the jury from considering defendant's defense by instructing the jury to disregard that evidence.

¶ 18    The trial court addressed each claim individually and denied defendant leave to file the successive petition, concluding that defendant failed to satisfy the cause-and-prejudice test or to set forth a colorable claim of actual innocence. Defendant now appeals, arguing the trial court should have granted him leave to file a successive postconviction petition and that petition

should advance to second-stage postconviction proceedings because Niles's affidavit constitutes newly discovered evidence that states a colorable claim of actual innocence.

¶ 19    As a threshold matter, we note that defendant did not explicitly raise a claim of actual innocence in his motion for leave to file a successive petition. However, because postconviction petitions are to be liberally construed and the content of Niles's affidavit is sufficient to raise a claim of actual innocence, we will address whether the court erred in denying defendant leave to file a successive petition. See *People v. Pack*, 224 Ill. 2d 144, 150 (2007) (stating postconviction petitions are to be " 'liberally construed to afford a convicted person an opportunity to present questions of deprivation of constitutional rights' ") (quoting *People v. Correa*, 108 Ill. 2d 541, 546 (1985)).

¶ 20                                    II. ANALYSIS

¶ 21    The Act permits a defendant to collaterally attack a conviction by asserting it resulted from a "substantial denial" of his constitutional rights. 725 ILCS 5/122-1(a)(1) (West 2016). However, the Act does not contemplate the filing of successive postconviction petitions. *People v. Edwards*, 2012 IL 111711, ¶ 22. As such, "[s]uccessive postconviction petitions are disfavored under the Act," and a defendant must first obtain leave of the court under one of two exceptions. *People v. Jones*, 2017 IL App (1st) 123371, ¶¶ 41, 45. In order to file a successive petition, the defendant's petition must satisfy the cause-and-prejudice test or it must state a colorable claim of actual innocence. *People v. Jackson*, 2016 IL App (1st) 143025, ¶ 19. The latter claim is permitted because "a wrongful conviction of an innocent person violates due process." *People v. Williams*, 392 Ill. App. 3d 359, 367 (2009). When a defendant raises a claim of actual innocence "leave of court should be granted when the petitioner's supporting documentation raises the probability that 'it is more likely than not that no reasonable juror would have convicted him in

the light of the new evidence.' " *Edwards*, 2012 IL 111711, ¶ 24 (quoting *Schlup v. Delo*, 513

U.S. 298, 327 (1995)). The requirements for establishing a claim of actual innocence are as

follows:

> "[T]he defendant must present new, material, noncumulative evidence that is so
>
> conclusive it would probably change the result on retrial. [*People v. Washington*,
>
> 171 Ill. 2d 475, 489 (1996)]. New means the evidence was discovered after trial
>
> and could not have been discovered earlier through the exercise of due diligence.
>
> See [*People v. Burrows*, 172 Ill. 2d 169, 180 (1996)]. Material means the
>
> evidence is relevant and probative of the petitioner's innocence. *People v. Smith*,
>
> 177 Ill. 2d 53, 82-83 (1997). Noncumulative means the evidence adds to what the
>
> jury heard. [*People v. Molstad*, 101 Ill. 2d 128, 135 (1984)]. And conclusive
>
> means the evidence, when considered along with the trial evidence, would
>
> probably lead to a different result. [*People v. Ortiz*, 235 Ill. 2d 319, 336-37
>
> (2009)]." *People v. Coleman*, 2013 IL 113307, ¶ 96.

To this end, "all well-pleaded facts that are not positively rebutted by the trial record are taken as

true." *People v. Harper*, 2013 IL App (1st) 102181, ¶ 38. We review a trial court's ruling on a

motion for leave to file a successive postconviction petition *de novo*. *People v. Bailey*, 2017 IL

121450, ¶ 13.

¶ 22    Here, defendant claims that he has presented a colorable claim of actual innocence based

on an affidavit by Niles. Defendant argues this affidavit tends to exonerate him in the

commission of these offenses.

¶ 23    We first address whether Niles's affidavit constitutes new evidence. On the one hand,

Niles's affidavit did not specifically state why defendant could not have obtained his testimony

sooner, nor did defendant allege what efforts he had taken to obtain this new account previously. See *People v. Barnslater*, 373 Ill. App. 3d 512, 525 (2007) (concluding that the evidence was not "newly discovered" because defendant did not show that the victim's recantation could not have been obtained earlier). On the other hand, as a codefendant, Niles had a "fifth amendment right to avoid self-incrimination," and thus, "[n]o amount of diligence could have forced him to violate that right if he did not choose to do so." *Edwards*, 2012 IL 111711, ¶ 38; *People v. Molstad*, 101 Ill. 2d 128, 135 (1984); *Harper*, 2013 IL App (1st) 102181, ¶ 42. We find the affidavit constitutes new evidence. We also find, and the State does not argue to the contrary, that the affidavit is both material and noncumulative. Niles's averments are relevant and also potentially probative of defendant's innocence. The evidence is also not cumulative because no one at trial testified that defendant was not involved in the offenses, which goes to an ultimate issue in the case. See *People v. Ortiz*, 235 Ill. 2d 319, 336 (2009) (citing *Molstad*, 101 Ill. 2d at 135).

¶ 24    Turning to the question of whether Niles's affidavit, "when considered along with the trial evidence, would probably lead to a different result" (*Coleman*, 2013 IL 113307, ¶ 96), we begin with the requirement that "[w]ell-pleaded factual allegations of a postconviction petition and its supporting evidence must be taken as true unless they are positively rebutted by the record of the original trial proceedings. [Citation.]" *People v. Sanders*, 2016 IL 118123, ¶ 48. We will carefully consider what it means for the evidence to be "taken as true unless positively rebutted by the record" and for the evidence to "probably lead to a different result." For this, we rely on our supreme court's decision in *Sanders*, 2016 IL 118123, and the decision by the United States Supreme Court in *Schlup*, 513 U.S. 298.

¶ 25　Our supreme court adopted the test for when leave of court should be granted to file a successive postconviction petition on the basis of actual innocence from the United States Supreme Court's decision in *Schlup*. *Edwards*, 2012 IL 111711, ¶ 24 ("leave of court [to file a successive postconviction petition on the basis of actual innocence] should be granted when the petitioner's supporting documentation raises the probability that 'it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence' (*Schlup v. Delo*, 513 U.S. 298, 327 (1995) (characterizing threshold standard as one of probability))"). In *Schlup*, the Supreme Court applied the test it formulated in *Murray v. Carrier*, 477 U.S. 478 (1986). *Schlup*, 513 U.S. at 331-32. The lower court had erroneously applied a different more stringent standard. *Id.* at 326-27. The more stringent standard required the petitioner to "show by *clear and convincing* evidence that but for a constitutional error, no reasonable juror would have found the petitioner" guilty. (Emphasis in original and internal quotation marks omitted.) *Id.* at 323. The appropriate *Carrier* standard requires the petitioner to "show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id.* at 327.

¶ 26　The *Schlup* Court pointed out that the standard it articulated is not the same as the standard "that governs review of claims of insufficient evidence." *Id.* at 330. That standard, "which focuses on whether any rational juror could have convicted, looks to whether there is sufficient evidence which, if credited, could support the conviction." *Id.* (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)). In explaining the distinction between the *Jackson* standard and the *Carrier* standard adopted in *Schlup* (and subsequently by our supreme court in *Edwards*), the *Schlup* Court explained "though under *Jackson* the mere existence of sufficient evidence to convict would be determinative of [the] petitioner's claim, that is not true under *Carrier*." *Id.*

"Indeed, our adoption of the phrase 'more likely than not' reflects this distinction. Under *Jackson*, the question whether the trier of fact has power to make a finding of guilt requires a binary response: Either the trier of fact has power as a matter of law or it does not. Under *Carrier*, in contrast, the habeas court must consider what reasonable triers of fact are likely to do. Under this probabilistic inquiry, it makes sense to have a probabilistic standard such as 'more likely than not.' Thus, though under *Jackson* the mere existence of sufficient evidence to convict would be determinative of petitioner's claim, that is not true under *Carrier*." *Id.*

¶ 27      We note this because the *Schlup* Court then found that the lower court's application of the wrong standard in that case "illustrates this difference." *Id.* at 331. The *Schlup* Court was not showing how it interprets the mandate to take the new evidence as true; instead, the court was providing an illustration of the difference between finding that the record contains sufficient evidence such that a reasonable juror *could* convict a defendant and finding that, in light of the evidence in the record and any new evidence, a reasonable trier of fact *likely would* convict the defendant. See *id.* at 330-31. The *Schlup* Court looked at the newly presented evidence in that case and found that if that evidence is true, which the lower court had assumed, then "it surely cannot be said that a juror, conscientiously following the judge's instructions requiring proof beyond a reasonable doubt, would vote to convict[2]—not because the Court took the evidence as

---

[2]The trial evidence consisted of testimony from two prison officials against an inmate, with no corroborating physical evidence, whereas Schlup's newly presented evidence included sworn statements from several inmate eyewitnesses exonerating him and statements that when combined with video evidence cast doubt on whether it was physically possible for the defendant to have committed the offense. It is in that context that the Court concluded a reasonable juror would believe Schlup's new evidence.

true and singularly accepted it above all of the other evidence but because under a proper application of the standard a "petitioner's showing of innocence is not insufficient *solely* because the trial record contained sufficient evidence to support the jury's verdict." (Emphasis added.) *Id.* at 331. Instead, "[i]n applying the *Carrier* standard *** the [lower] [c]ourt must assess the probative force of the newly presented evidence *in connection with the evidence of guilt adduced at trial*." (Emphasis added.) *Id.* at 331-32. However, our supreme court has subsequently clarified that in *Edwards* it "merely cited the *Schlup* case. [Our supreme court] did not hold that the trial court could effectively assess the credibility of witnesses and affiants by judging the reliability of their statements." *Sanders*, 2016 IL 118123, ¶ 37.

¶ 28    In *Sanders*, the appellate court affirmed the second-stage dismissal of a second successive postconviction petition. *Id.* ¶ 20. The appellate court "rejected [the] petitioner's argument that the trial court made an improper credibility determination when it relied on its finding at [a codefendant's earlier] postconviction hearing that Bingham [(the codefendant whose earlier testimony the petitioner offered in support of the second successive postconviction petition at issue)] was not a credible witness." *Id.* The appellate court also found that an affiant's testimony offered in support of the successive petition "was not of such conclusive character as to probably change the result on retrial. The [appellate] court noted that there was substantial credible evidence at [the] petitioner's trial that Bingham did not act alone." *Id.*

¶ 29    On appeal to our supreme court in *Sanders*, the State argued "a threshold finding of trustworthiness must be made before a court may determine whether a postconviction petitioner has set forth a colorable claim of actual innocence" and "may not mechanically assume that statements in an affidavit *** are true." *Id.* ¶ 32. Our supreme court rejected the State's argument based on its prior decision in *People v. Coleman*, 183 Ill. 2d 366, 390 (1998). In *Coleman*, the

State argued the issue was whether an affiant's recantation of her trial testimony was reliable, and our supreme court held that argument was premature. *Sanders*, 2016 IL 118123, ¶ 36 (citing *Coleman*, 183 Ill. 2d at 390). The court found that the *Coleman* petitioner's "allegations, supported by *** affidavit, had not been refuted or denied. *** [T]he original trial record did not controvert the charges [in the petition] that perjured evidence was used and that favorable evidence was knowingly suppressed by the State." *Id.* Our supreme court held the standard is the same for successive petitions and all well-pleaded factual allegations must be taken as true. *Id.* ¶ 37. The *Sanders* court then turned to the question of whether "the trial court was required to accept Bingham's testimony as true and [whether] it made an impermissible credibility determination when it looked to [the codefendant's] postconviction hearing to reject the testimony." *Id.* ¶ 39. The court held the trial court erred in considering the credibility determination the trial court made after hearing Bingham's recantation testimony at another codefendant's postconviction evidentiary hearing. *Id.* ¶ 42. The *Sanders* court stated that "[c]redibility determinations may be made only at a third-stage evidentiary hearing." *Id.* (citing *Coleman*, 183 Ill. 2d at 390).

¶ 30    In so holding, our supreme court cited *People v. Knight*, 405 Ill. App. 3d 461 (2010), for the proposition that all well-pleaded allegations of the petition and accompanying affidavits are taken as true unless positively rebutted by the record of the proceedings from which the petitioner seeks postconviction relief "and not any other related proceedings," and that "[c]redibility of witnesses is a matter that can only be resolved by an evidentiary hearing." *Sanders*, 2016 IL 118123, ¶ 40.

¶ 31    The *Sanders* court also cited *Harper*, 2013 IL App (1st) 102181, in which the State argued that the affiant's testimony was positively rebutted by the trial record and the appellate

court had rejected the affiant's similar testimony in a codefendant's appeal. *Sanders*, 2016 IL 118123, ¶ 41. The appellate court "rejected the State's implication that the rejection of *** testimony in [a] related proceeding should dictate a similar result in the petitioner's case" and that "the findings of the appellate court in the codefendant's appeal could not be substituted for a third-stage evidentiary hearing in the petitioner's case." *Id.* As to the merits of the claim that the record of the defendant's trial positively rebutted the affidavit in *Harper*, the appellate court in *Harper* found only that based on its review of the record it could not say that the affiant's testimony was positively rebutted. *Harper*, 2013 IL App (1st) 102181, ¶ 44. The *Harper* court also found that "the State's argument [was] an invitation for [the] court to engage in credibility determinations as to whether the defendant's confession or [the affiant's] confession was more believable," and the court refused to make such determination. *Id.* Finally, the *Harper* court found that the affiant's testimony was "not positively rebutted by the physical evidence at trial." *Id.*

¶ 32    The *Sanders* court ultimately found that the petitioner's evidence was "not of such conclusive character that it would probably change the result on retrial." *Sanders*, 2016 IL 118123, ¶ 47. The *Sanders* court began its discussion of its holding that the evidence was not so conclusive that it is more likely than not that no reasonable juror would find the defendant guilty beyond a reasonable doubt by reiterating that well-pleaded factual allegations of a postconviction petition and its supporting evidence must be taken as true unless they are positively rebutted by the record of the original trial proceedings. *Id.* ¶ 48. Among the evidence noted by the *Sanders* court was testimony by witnesses at the trial that the petitioner was present and involved in the crime, identification by a witness involved in the crime of the petitioner at the trial, testimony corroborating the version of events testified to at trial, and evidence of the petitioner's statement

to police not admitting guilt but also corroborating the evidence at trial that had defendant involved in the crime. *Id.* ¶¶ 48-51. The court also noted the evidence presented by the defense at the trial. *Id.* ¶ 52. The *Sanders* court concluded that the recantation was contrary to the recanting codefendant's own testimony at the trial and the testimony of two witnesses who positively identified the petitioner as being with the codefendant on the night of the offense and as having participated in the crime. *Id.* The court held the testimony "merely adds conflicting evidence to the evidence adduced at the trial. *Even taking the well-pleaded facts as true*, we conclude that the recantation is not of such conclusive character as would probably change the result on retrial." (Emphasis added.) *Id.* The court held the same must be said of the factual statements in an affidavit offered in support of the successive petition that the recanting codefendant acted alone. The court found those statements "merely contradict the testimony of other occurrence witnesses" and the codefendant's recantation. *Id.* ¶ 53. The court held the affiant's testimony "would merely add to the evidence the jury heard at [the] petitioner's trial. It is not so conclusive in character as would probably change the result on retrial, either by itself or in conjunction with [the codefendant's] recantation." *Id.*

¶ 33     The only evidence in support of petitioner's successive postconviction petition at issue in this case is Niles's affidavit. Given its importance, we set out the affidavit in its entirety:

> "I, Lino Niles do hereby declare & affirm that the following information within this affidavit is true and correct in substance and in facts:
>
> To whom it may concern I submit this affidavit in the form of a letter asking that it be taking as being true on the merits of my reason's of which I sincerely apologize for, or me including Droopy/Ahmad Simms in the case of which I committed murder. Some say that people do things out of fear because of

the surrounding circumstances of those events [unreadable/stricken] taken place. I on the other hand chose differently and act simply out of 'revenge', and told the police that Droopie/Ahmad was with me when I did the murder-home invasion-armed robbery. I included him because I thought when police took guys to the police station in a sweep off my block and question'd them, that Droopie/Ahmad Simms was with the guys tellin [*sic*] the police about me[,] knowing that I didn't mess with nobody else on that block but him at that time. And Yes I considered Droopy at that time my best friend and felt that it was the ultimate betrayal for him to tell on me [unreadable] one I trusted other than myself out on these streets. However Droopie/Ahmad Simms knew about what happened just like everybody else because it happened in the hood. I just lied about certain things that whereas he really cared not to know. But I never told him I was the one who did it in no shape form or fashion, I just told him that I needed his help in selling some stuff so that I could get some money in my pocket. In the end the fact of the matter is, I lied to the police about Droopie/Ahmad Simms being involved to shift the blame from myself by all means possible. Even to the point where I took the police where he would spend the night before his mother would come & pick him up to go back home out the city. I told police he had the gun and that he had some of the stuff that I took out of the [apartment] hoping in the end by me doing so that I would be able to walk free or at least do a little time. But coming t [*sic*] the conclusion of things after everything was put on the table *** now realize in all my effortless rationale attempts that I actually caused an innocent person to be locked up who had absolutely no involvement whatsoever. I know I have surely

lost a friend but one thing for sure that I will not lose is 'my dignity' to do right as a man, no matter how long it has taken me to say the truth or will take me to say the truth.

I am truly sorry for getting Droopie locked up and I accept full responsibility of my actions in doing so. For my selfish means and ways of being free I even witness'd my sacrifices getting afflicted upon Droopie/Ahmad Simms by the police and know that the police had believed everything that I told them to the point they would go to those extreme measures just to get to the truth even if it wasn't the truth. I also apologize for him going through that physical abuse and any other abuse he may had or have suffered. I don't know in the end of what would be the outcome of me now admitting to the murder but just know that me and my other co-defendant Curtis King was the only two involved. Whether you believe me or not, and I'm not trying to be disrespectful when I say this, 'is totally up to you.' Am so in the event of everything that I've admitted to, not reaching [unreadable] hands of Droopie/Ahmad Simms in time. I just want to go on record and said that I'm sorry for getting you locked up and I hope that you can find it within your heart to forgive me if this [unreadable].

Pursuant to 28 U.S.C. 1746, 18 U.S.C. 1621 or 735 ILCS 5/1-109, I declare under penalty of perjury, that everything contained herein is true and accurate to the best of my knowledge and belief. I do declare and affirm that the matter at hand is not taken either frivolously or maliciously and that I believe the foregoing matter is taken in good faith."

¶ 34    Pursuant to *Sanders*, our first task is to determine whether these statements are positively rebutted by the record. To make that determination we must first pull from Niles's affidavit what Niles actually says about defendant's "actual innocence" of the crimes for which he was convicted. We note again the trial court convicted defendant of first degree murder on the basis of accountability, home invasion, and armed robbery. Niles's affidavit avers about defendant that

>    (1) Niles acted out of revenge when he told police defendant was with him when Niles committed the murder, home invasion, and armed robbery. (Niles did not say that defendant was not with him when Niles committed the murder, home invasion, and armed robbery. Niles could mean he acted out of revenge in revealing defendant's participation.)[3]

>    (2) Niles "included" defendant because Niles thought defendant was informing the police about Niles. (What Niles thought defendant was telling police about him is unclear.)

>    (3) Defendant knew about the crime "just like everybody else." (Niles does not say this is the only reason defendant knew about the crime, and as will

---

[3]Notably, in *Edwards*, our supreme court considered whether the petitioner in that case set forth a colorable claim of actual innocence or, "[i]n other words, did [the] petitioner's request for leave of court and his supporting documentation raise the probability that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence," where the petitioner relied on the affidavit of a codefendant who averred the petitioner " 'had nothing to do with this shooting' and was neither 'a part [of nor] took part in this crime.' " *Edwards*, 2012 IL 111711, ¶¶ 31, 39. Our supreme court found the affidavit did not raise the probability that, in light of that new evidence, it is more likely than not that no reasonable juror would have convicted the petitioner because the evidence was "not 'of such conclusive character that it would probably change the result on retrial' [citation]. [Citations.]" *Id.* ¶ 40. Our supreme court noted that the petitioner "critically [did] not assert that [the] petitioner was not present when the shooting took place" and the affiant's "averment in his affidavit that he was the principal offender 'does little to exonerate [the] defendant who *** was convicted of the murder under the theory of accountability.' " (Emphasis omitted.) *Id.* ¶ 39.

be revealed later in Niles's affidavit, neighborhood gossip was not the only reason defendant knew about the crime.)

(4) Niles lied to defendant about "certain things" that defendant did not want to know. (What things Niles lied about is unknown.)

(5) Niles never told defendant he (Niles) "was the one who did it;" Niles only told defendant Niles needed defendant's help to sell some things. (Did what, exactly is open to interpretation: it might mean firing the fatal shot. Niles may have told defendant he needed defendant's help to sell the things they planned to take from Irving together.)[4]

(6) Niles lied to police about defendant being "involved." (Niles does not say what involvement, or level of involvement, he lied about. He may mean he lied about defendant having any involvement, or any involvement in the execution of any discrete element of the crime, leaving open the possibility of defendant's "involvement" in any portion of the crime from its planning to the disposal of its proceeds.)

(7) Niles told police defendant had the gun and some proceeds from the crime to downplay his own culpability. (Niles's motive for pointing police in defendant's direction does not exonerate defendant.)

(8) Niles caused an "innocent" person to be locked up because defendant "had no involvement whatsoever." (Niles does not say what, exactly, defendant is "innocent" of. And again, "involvement" in *what* is left vague. Defendant may

---

[4]To be accountable, defendant had to intentionally help plan or commit the crimes "either before or during the commission of [the] offense[s]." 720 ILCS 5/5-2(c) (West 2016).

have had no "involvement whatsoever" in the decision to pull the trigger, or in physically taking the proceeds of the robbery, and still assisted Niles to gain entry for the purpose of taking the items Niles told defendant he needed to sell to get some money in his pocket.)

(9) "I don't know in the end of what would be the outcome of me now admitting to the murder but just know that me and my other co-defendant Curtis King was the only two involved." (Niles does not unequivocally state that only he and King robbed Irving's apartment, or murdered her, or that defendant committed no crimes related to the offenses. Niles notably did not mention the robbery and home invasion.)

¶ 35    The following evidence was adduced at defendant's trial pertinent to our current inquiry: According to Parks's testimony the offenders gained entry to Irving's building through the basement door. The crime occurred between 11 a.m. and 2 p.m. According to witness Raymond Orange's testimony, at around 1:15 p.m. on the day of the murder defendant and Niles walked out of Irving's building, walked to the garbage, and returned to Irving's building. One of them had something under his arm. According to Jimmy Minter's testimony, defendant and Niles came to Minter's auto shop located just two buildings north of the scene of the crime sometime after 3 p.m. on the day of the crime. Minter testified a pry bar was missing from his toolbox that afternoon. Defendant sold Minter a VCR. Niles was in possession of a bag of coins and a purple attaché case. Parks testified that coins, a VCR, and maroon attaché case were missing from Irving's apartment.

¶ 36    Detective Baker testified the basement door, the door to Irving's apartment, and the door to the second-floor apartment were damaged.

¶ 37    Additionally, defendant gave two statements to police, both of which were substantially the same. In the first statement defendant told police he saw Niles at Minter's auto shop on the morning of the murder, and Niles told defendant that Niles had been stalking Irving because Irving had won the lottery. Defendant and Niles went to Irving's home. Defendant had a pry bar, and Niles had a gun. Defendant told police that the basement door to Irving's home looked like Niles had previously tried unsuccessfully to pry open the door. Defendant and Niles then broke the basement door open and entered. Defendant told police he and Niles went upstairs, pried open the foyer door, and entered Irving's apartment. Defendant told police that Irving started screaming and Niles put a pillow over her face and shot her in the head. Defendant then grabbed the VCR and other items, while Niles took coins and anything else he could find. According to defendant's statement, he then took the VCR and a television outside then returned to the apartment. When defendant returned, Niles told defendant to try to get into the second-floor apartment. Defendant tried, but he and Niles fled when he heard noises outside. Defendant told police he and Niles took the contraband to the auto shop, where defendant sold the VCR and television to Minter. Niles told defendant to dispose of the gun. Defendant took a bus to his aunt's home, where he sold the gun on the street.

¶ 38    Assistant State's Attorney Thomas Darman testified that he interviewed defendant on December 2, 1999, and defendant told him a similar version of events that he told Baker. After Darman interviewed Curtis King, he spoke with defendant again. Defendant told him the same version as before, except now he included that King served as a lookout. King also helped them remove items from the apartment.

¶ 39    In assessing whether the evidence in support of the successive postconviction petition is positively rebutted by the evidence adduced at trial we make the following observations:

(1) Based on the timeline and positive identification, Orange testified defendant was with Niles when Niles committed the murder, home invasion, and armed robbery.

(2) Niles's statement as to why he informed police about defendant is not a fact that can be refuted but is not exonerating.

(3) There is evidence in the record defendant knew about the crime because he participated. Orange testified defendant was present. Minter testified defendant sold him proceeds from the robbery. Orange's statement is consistent with the statement defendant gave police, and defendant's statement is consistent with the physical condition of the doors in Irving's building.

(4) Niles's statement that he lied to defendant about "certain things" is not a fact that can be refuted but is not exonerating without knowing what Niles lied about.

(5) What Niles did or did not tell defendant is not refuted but is not exonerating without knowing what Niles is referring to when Niles states that he was "the one who did it." (For example, Niles could plausibly mean shooting Irving while defendant was on the second-floor trying to gain entry.)

(6) Niles's statement that he lied to police about defendant being "involved" is not a fact that can be refuted but is not exonerating without knowing what Niles lied about defendant being involved in. (For example, Niles could plausibly mean "involved" in the murder but not that he lied about defendant being "involved" in the home invasion and robbery.)

(7) Niles's statement as to why he informed police about defendant is not a fact that can be refuted and is not exonerating.

(8) Niles's statement that defendant is "innocent" and that Niles lied to police about defendant being "involved" is not refuted but is not exonerating without knowing what Niles believes defendant is "innocent" of (The murder? The home invasion? The robbery? All of the above?) or what Niles allegedly lied about defendant being involved in. (For example, Niles could plausibly mean "involved" in the murder but not that he lied about defendant being "involved" in the home invasion and robbery.)

(9) Niles's statement that he and King were the only two "involved" is not refuted but is not exonerating without knowing what Niles is admitting they were "involved" in.

¶ 40    We turn once again, as we must, to *Sanders* for guidance into our inquiry. *People v. Greenman*, 38 Ill. App. 3d 734, 735 (1976) ("We, of course, are bound by the decision of our Supreme Court, which has also said: 'Where the Supreme Court has declared the law on any point, it alone can overrule and modify its previous opinion, and the lower judicial tribunals are bound by such decision and it is the duty of such lower tribunals to follow such decision in similar cases.' [Citation.]"). In *Sanders*, the codefendant's recantation included testimony that the codefendant shot the victim once, whereas the trial evidence included testimony by the pathologist who performed the autopsy of the victim that the victim was shot twice in the back of the head. *Sanders*, 2016 IL 118123, ¶ 48. Our supreme court found that part of the recantation claiming to have shot the victim only once was "positively rebutted by the trial record." *Id.* The *Sanders* court went on to point out contradictions in the evidence adduced at trial and the

evidence offered in support of the successive postconviction petition including testimony the defendant was present at the crime and participated in the crime, corroborating testimony, and the defendant's statements. *Id.* ¶¶ 48-51. The court also noted the defense evidence from trial. *Id.* ¶ 52.

¶ 41 It has been suggested the *Sanders* court did not take the allegations in support of the successive postconviction petition in that case as true because they were not "unrebutted" by the record evidence. See *People v. Brown*, 2017 IL App (1st) 150132, ¶ 68. That would certainly explain our supreme court's holding in *Sanders* in the face of its admonition that well-pleaded factual allegations of a postconviction petition and its supporting evidence must be taken as true unless they are positively rebutted by the record of the original trial proceedings. *Sanders*, 2016 IL 118123, ¶ 48. However, we note that our supreme court did not, after recounting the evidence at issue, repeat its conclusion made earlier regarding the number of shots that killed the victim, that the evidence was "positively rebutted by the trial record." Rather, the court stated the recantation was "contrary" to or "contradicted" evidence presented at trial and merely added "conflicting evidence to the evidence adduced at the trial." *Id.* ¶¶ 52-53. We make no findings as to whether these are distinct findings by our supreme court. Regardless if they were or not, the *Sanders* court concluded the postconviction evidence was not of such conclusive character as would probably change the result on retrial. *Id.*

¶ 42 In *Sanders*, the codefendant stated he was alone when he committed the offense and that his prior testimony identifying the petitioner as participating in the crime was not true. *Id.* ¶ 16. A witness who provided an affidavit in support of the successive postconviction petition averred that the codefendant acted alone at all times when she was observing the commission of part of the offense (aggravated kidnapping). *Id.* ¶ 15. If all that were required was to take the recantation

and averment as true and would be believed by a reasonable juror and ask if the defendant could still be convicted, then the result of the petitioner's trial in *Sanders* would have to have been different: based on that "true" evidence Sanders did not commit aggravated kidnapping and did not participate in the murder. The only explanation for our supreme court's holding is that more is required of courts considering claims of actual innocence. See *Schlup*, 513 U.S. at 329 ("the *Carrier* standard requires a petitioner to show that it is more likely than not that 'no reasonable juror' would have convicted him. The word 'reasonable' in that formulation is not without meaning. *It must be presumed that a reasonable juror would consider fairly all of the evidence presented.* It must also be presumed that such a juror would conscientiously obey the instructions of the trial court requiring proof beyond a reasonable doubt." (Emphasis added.)). " 'Conclusive' means the new, material, noncumulative evidence, considered with the trial evidence, would 'probably lead to a different result.' [Citation.] 'Probability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together.' [Citations.]" *People v. Gonzalez*, 2016 IL App (1st) 141660, ¶ 28. This standard "properly balances the dictates of justice with the need to ensure that the actual innocence exception remains only a safety valve for the 'extraordinary case[.]' [Citation.]" (Internal quotation marks omitted.) *Schlup*, 513 U.S. at 333 (O'Connor, J., concurring).

¶ 43    We are bound to follow the lead of *Sanders* and examine the record evidence to determine whether the postconviction evidence would merely add conflicting evidence to the evidence heard at trial and, therefore, is not of such conclusive character as would probably change the result on retrial, even where, as in *Sanders*, the postconviction evidence includes a statement that the defendant was not involved in the crime. *Sanders*, 2016 IL 118123, ¶ 48 ("Bingham testified at petitioner's trial, implicating petitioner in the kidnapping and murder of

Crooks. Now, he has recanted that testimony and claims that petitioner was not involved."). In making that determination we are not bound to disregard defendant's confession. See, *e.g.*, *People v. Harris*, 206 Ill. 2d 293, 301-02 (2002) (rejecting claim of actual innocence where codefendants averred that stating the defendant had shot the victim had been a "scheme," where the defendant confessed, was identified by an eyewitness, and statements by the defendant and codefendants "describe[d] in strikingly similar detail the circumstances of the crime"). In federal *habeas* proceedings, "under the gateway standard we describe today, the newly presented evidence may indeed call into question the credibility of the witnesses presented at trial. In such a case, the habeas court may have to make some credibility assessments." *Schlup*, 513 U.S. at 330. However, Illinois courts may not "effectively assess the credibility of witnesses and affiants by judging the reliability of their statements." *Sanders*, 2016 IL 118123, ¶¶ 37, 42 ("credibility is not an issue at the second stage of postconviction proceedings"). In attempting to reconcile these apparently competing directives, we conclude, based on our supreme court's holding in *Sanders*, that we must nonetheless carefully examine the nature and character of the new evidence in light of the record evidence to determine whether that new evidence "is so conclusive that it is more likely than not that no reasonable juror would find [the petitioner] guilty beyond a reasonable doubt." *Id.* ¶¶ 47, 52-53; see also *People v. Brown*, 2017 IL App (1st) 150132, ¶ 68, *vacated and appeal dismissed*, *People v. Brown*, No. 123252 (Ill. Jan. 24, 2019); *People v. Warren*, 2016 IL App (1st) 090884-C, ¶ 87 n.3 ("The dissent also writes, 'Contrary to the majority's opinion, we can, without making any credibility determinations, conduct a *de novo* review comparing the new proffered evidence and the evidence presented at trial, and decide whether the new evidence is of such a conclusive character that the outcome of defendant's trial would have been different.' [Citation.] *Nowhere in our opinion have we suggested that this analysis cannot be*

*conducted. In fact, it is precisely the inquiry that we have undertaken above.* While the dissent may disagree with the conclusion we have reached in conducting that analysis, it is inaccurate to say that we have not conducted it or that we have said such an analysis is impossible." (Emphasis added.)).

¶ 44    We do not find that Niles's affidavit constitutes conclusive evidence that would probably lead to a different result at trial. See *Sanders*, 2016 IL 118123, ¶ 47 (stating that "the conclusiveness of the new evidence is the most important element of an actual innocence claim"). The evidence in the affidavit must be "so conclusive that it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt." *Id.* The only truly exonerating averment in Niles's affidavit is that defendant was not with him when Niles committed the home invasion, robbery, and murder. If construed liberally in defendant's favor (see *Coleman*, 183 Ill. 2d at 382), Niles's statement that he and King were the only two "involved," although not clear, could also be considered exonerating. Both averments are contradicted by direct evidence in the form of Orange's testimony positively identifying defendant as having been with Niles and walking out of Irving's residence carrying something and walking back in and circumstantial evidence in the form of Minter's testimony that defendant sold Minter likely proceeds from the robbery. Orange identified defendant from a photo array twice after observing defendant and Niles entering and exiting Irving's apartment on the day of the murder. Minter identified Niles and defendant as coming into his auto shop on the day of the murder and selling him a VCR. Minter also testified that they had other items consistent with those taken from the apartment. At best, Niles's affidavit might "provide a basis to argue the existence of a reasonable doubt," but that is not the standard for a claim of actual innocence. *People v. Anderson*, 401 Ill. App. 3d 134, 141 (2010).

¶ 45    That is to say nothing of the evidence of defendant's multiple confessions, which we have no legal basis to ignore. Defendant's written statement and his videotaped statement admitting to his involvement in the home invasion and armed robbery of the victim's apartment were introduced. The details of defendant's statements were consistent with the observations of the investigating officers and the recovered evidence. Specifically, defendant stated that he and Niles used a large pry bar to open the basement door and the apartment door. Defendant also stated he attempted to break into the second-floor apartment. Detective Baker observed damage to all three doors. Defendant also stated that, upon breaking into the apartment, Niles placed a pillow over Irving's face and shot her in the head with a .25-caliber handgun. Ginnelly, a forensic investigator testified that he recovered a .25-caliber cartridge case underneath a couch cushion, and Dr. Chira, a medical examiner, testified that Irving had a single contact gunshot wound above her right forehead. Defendant further stated that he and Niles removed numerous items from the apartment, including a television, VCR, a brown suitcase filled with coins, and a jar of coins, and took the stolen items to the auto shop, where defendant sold the television and VCR to Minter. Parks testified that these were some of the items missing from the apartment, and Minter testified that on the date of the murder defendant and Niles came into the auto shop and sold him a VCR. Minter saw that Niles had a briefcase and coins with him.

¶ 46    Defendant argues that his inculpatory statements were involuntary, that he was "merely parroting" what the police wanted him to say, and that Orange had credibility issues due to his own pending criminal case and his inability to identify defendant in court. He further argues that Niles's statement that only himself and King were present for the offense corroborates Orange's physical description of the men he saw that day in Irving's backyard. However, "[a] 'free-standing' claim of innocence means that the newly discovered evidence being relied upon 'is not

being used to supplement an assertion of a constitutional violation with respect to [the] trial.' " *People v. Hobley*, 182 Ill. 2d 404, 443-44 (1998). Defendant describes his claim that his confession was false and involuntary as "consistent and long-standing." The alleged involuntariness of defendant's statements is not newly discovered, material, and noncumulative or of such conclusive character that it would probably change the result on retrial.

¶ 47    Niles's affidavit, even taken as true, with all its vagueness and uncertainty and in light of the evidence adduced at trial, is not of such conclusive character as would probably change the result on retrial. As demonstrated above, the affidavit "merely adds conflicting evidence to the evidence adduced at the trial." See *Sanders*, 2016 IL 118123, ¶ 52. Thus, defendant has "failed to carry his burden to make a substantial showing of a claim of actual innocence." *Id.* ¶ 55.

¶ 48                                    III. CONCLUSION

¶ 49    For the reasons set forth above, we affirm the judgment of the circuit court of Cook County.

¶ 50    Affirmed.

¶ 51    Presiding Justice Ellis, dissenting:

¶ 52    I agree with most of the majority's findings: Lino Niles's affidavit is new, material, and non-cumulative evidence of defendant's innocence. But I would go one step further and hold that Niles's affidavit, taken as true, is also conclusive evidence. If we believe Niles—and at this stage we must—defendant did not commit or aid any of the crimes that sent him to prison; Niles and Curtis King committed those crimes without defendant's help. Defendant should be given leave to file his petition, so that an attorney can argue for an evidentiary hearing on his innocence, where the credibility and strength of Niles's assertions can be properly evaluated by a judge.

¶ 53    The majority and I fundamentally disagree about the correct procedure for evaluating an innocence claim at the initial stage of a post-conviction petition. The disagreement turns on this

question: What does it mean to take an affidavit *as true*? Do we merely assume that the affiant would testify consistently with the affidavit at a new trial? Or must we assume that a reasonable juror, hearing the affiant's testimony at a new trial, would *believe* it—which is just to say, take it as true?

¶ 54    On the majority's approach, we simply assume that the affiant would testify at a new trial as he did in his affidavit. We then weigh that new evidence (of innocence) against the contrary evidence (of guilt) presented at the original trial, and decide which evidence a reasonable juror would likely believe. Weighing the evidence here, the majority finds that the evidence of guilt offered at trial was "overwhelming," and thus the new evidence presented in Niles's affidavit probably would not have changed the verdict. It is in *this* sense that the majority says Niles's affidavit is not "conclusive."

¶ 55    For reasons I have explained elsewhere, this procedure of weighing the evidence is inappropriate at the initial stage of a post-conviction proceeding. See, *e.g.*, *People v. Brown*, 2017 IL App (1st) 150132, ¶¶ 100-113 (Ellis, J., dissenting). My dissent in *Brown* did not persuade the majority, but the supreme court granted Brown leave to appeal, at which stage the State conceded that Brown was entitled to a second-stage post-conviction hearing. The supreme court thus ordered us to vacate our decision and remand to the trial court to advance his claims for a second-stage hearing. See *People v. Brown*, No. 123252, 2019 WL 323891, at *1 (Ill. Jan. 24, 2019).

¶ 56    I realize that no precedential value can be gleaned from a supervisory order from our supreme court, based on a party's concession. But it's at least notable that the State didn't even *try* to defend the majority's decision in *Brown*. In any event, I will reiterate what, in my opinion,

is the proper review of a successive post-conviction petition arguing actual innocence at the leave-to-file stage.

¶ 57    At this initial stage, we are required to accept "[a]ll well-pleaded factual allegations"— including those set forth in Niles's affidavit—as true. *People v. Sanders*, 2016 IL 118123, ¶ 42. If taking Niles's affidavit testimony *as true* means anything at all, it must mean that a juror, hearing from Niles at a hypothetical retrial, would *believe* his testimony. (To "believe" just means "to accept something as true, genuine, or real." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/ dictionary/believe (last visited, June 3, 2019)). We then ask whether it is more likely than not that no reasonable juror, hearing *and believing* this evidence, alongside all the other evidence presented at trial, could convict defendant. *People v. Edwards*, 2012 IL 111711, ¶ 24.

¶ 58    The answer to that question here is clear. Defendant was convicted of home invasion, armed robbery, and the first-degree murder of Susie Irving. The State's theory at trial was that defendant, Niles, and King broke into Irving's apartment to steal money and other valuables. To their surprise, Irving was home at the time, and Niles shot her in furtherance of the planned crimes. Defendant, having joined in the plan to rob Irving, was thus accountable for her murder.

¶ 59    In his affidavit, Niles now attests that he and King were "the only two involved" in these crimes. Defendant "had absolutely no involvement whatsoever." Niles "lied to the police" when he told them that defendant "was with me when I did the murder-home invasion-armed robbery." (Niles's reported reasons for lying need not concern us at this stage.) Niles sought defendant's help only *after* committing these crimes, when he asked defendant for "his help in selling some stuff," namely, the items he had stolen from Irving.

¶ 60    If a juror *believed* Niles's affidavit testimony, that juror could only believe that defendant did not set foot in Irving's apartment with Niles and King, and did not assist them in any way, either before or during their crimes. A reasonable juror could not convict defendant of home invasion, armed robbery, or first-degree murder in that scenario, either on a theory of direct liability or accountability.

¶ 61    The majority does not assume that a reasonable juror would *believe* Niles. Instead, the majority merely assumes that Niles would testify consistently with his affidavit. The majority then weighs the evidence from Niles against the evidence at trial implicating defendant and determines that a reasonable juror would probably *not* believe Niles, in light of the other evidence.

¶ 62    That, in my view, is an incorrect analysis. The majority is not supposed to merely assume that Niles would testify as he did in his affidavit; the majority is supposed to take the substance of that affidavit testimony as *true*—meaning the jury would *believe* it—and *then* determine whether a reasonable juror could still vote to convict. In concluding that a jury would probably *not* believe the new evidence, because it is outweighed by the evidence of guilt, the majority makes two errors that go hand-in-hand. First, the majority does not take "[a]ll well-pleaded factual allegations as true." *Sanders*, 2016 IL 118123, ¶ 42. Second, in deciding *not* to believe certain well-pleaded factual allegations, the majority implicitly, if not explicitly, makes its own credibility determinations. And that is something a court may not do at the first stages of a post-conviction proceeding, before an evidentiary hearing has been held. *Id.*

¶ 63    For an illustration of the correct analysis, in my view, look no further than *Schlup v. Delo*, 513 U.S. 298 (1995), the case that our supreme court cited for the adoption of its test for leave to file a successive petition alleging actual innocence. See *Edwards*, 2012 IL 111711, ¶ 24.

Schlup was convicted of murdering another prison inmate. *Schlup*, 513 U.S. at 301-02. The State's case was based on testimony by two corrections officers who witnessed the killing. *Id.* at 302. In his federal *habeas* petition, Schlup presented new evidence that another guard saw him elsewhere in the prison right around the time of the murder, and statements of multiple eyewitnesses who swore that Schlup did not commit the crime. *Id.* at 307-10. The lower courts denied Schlup's petition, but the Supreme Court reversed.

¶ 64    In his analysis of the lower courts' errors, Justice Stevens isolated a key inquiry that the lower courts had misunderstood. As he explained, "[t]hose new statements may, of course, be unreliable. But *if they are true* *** it surely cannot be said that a juror, conscientiously following the judge's instructions requiring proof beyond a reasonable doubt, would vote to convict." (Emphases added.) *Id.* at 331. For that reason, the affidavits, if believed, would make a sufficient "showing of innocence" for Schlup's claim to prevail. See *id.* And as I explain in more detail below, it is that test—for the *legal* sufficiency of an actual-innocence claim—that our supreme court adopted from *Schlup* as the test for leave to file. See *Edwards*, 2012 IL 111711, ¶ 24; *Sanders*, 2016 IL 118123, ¶¶ 32, 37, 42.

¶ 65    In short, the Supreme Court looked at the new affidavits and reasoned that, if they were true—if the jury believed them—no juror could convict Schlup. My position is consistent with the Supreme Court's analysis, as I apply the same inquiry as Justice Stevens. And that inquiry yields the same conclusion in this case, for much the same reasons: No juror could convict defendant if the juror believed that he was not even present when Niles and King broke into Irving's apartment and killed her.

¶ 66    Although the basis for the Supreme Court's reversal in *Schlup* was the lower courts' use of an incorrect legal standard, the Court's analysis made clear that neither the district court nor

the appellate-court majority had grasped what it means to take the new affidavits *as true*. See *Schlup*, 513 U.S. at 330-32. The flaws in both courts' reasoning, as pointed out by Justice Stevens, require close scrutiny. The majority's analysis here combines elements of both.

¶ 67     The district judge rejected Schlup's innocence claim without a hearing, after finding that the new affidavits, on their face, were not persuasive enough to overcome the trial testimony of the two prison guards—in part because the affidavits came years later, and in part because many of them came from prison inmates. *Id*. at 309 n.19. As the Eighth Circuit would later recognize, the district court never asked whether the affidavits would establish Schlup's innocence *if* they were believed. *Schlup v. Delo*, 11 F.3d 738, 741 (8th Cir. 1993). The district court immediately threw the affidavits into the mix with the trial evidence, asked whether they would be enough to change the verdict, and concluded that they wouldn't, precisely because, in the district court's first-blush view, the jury would *not* believe them. (The district court later changed its mind, and found the affiants credible, after they testified at a hearing on remand. *Schlup v. Delo*, 912 F. Supp. 448, 450-55 (E.D. Mo. 1995).).

¶ 68     Like the district court in *Schlup*, the majority here weighs the new evidence of innocence against the old evidence of guilt, and concludes that a jury would *not* believe the new evidence. That procedure, as I have explained, does *not* take the new evidence as true.

¶ 69     What's more, it is also a procedure that Illinois courts are flatly prohibited from applying at the pleading stages, before an evidentiary hearing has been held. *Sanders*, 2016 IL 118123, ¶¶ 37, 42. In fact, our supreme court explicitly held in *Sanders* that Illinois courts differ from federal *habeas* courts in this respect: We have *no* discretion to "effectively assess the credibility of witnesses and affiants by judging the reliability of their statements" before holding a hearing, even if, as the State pointed out, *Schlup* itself allows federal *habeas* courts to exercise a limited

discretion in this regard. *Id.* ¶¶ 32, 37; see *Schlup*, 513 U.S. at 332. And this difference makes the majority's procedure of weighing the evidence at the leave-to-file stage *doubly* problematic.

¶ 70      A divided panel of the Eighth Circuit affirmed the denial of Schlup's petition. *Schlup*, 11 F.3d 738. The panel majority concluded that even assuming the affidavits were credible, they merely created a conflict in the evidence—a credibility contest between the old and the new witnesses—and for that reason failed to decisively refute the two prison guards' trial testimony. *Id.* at 741. Thus, the affidavits fell short of truly establishing Schlup's innocence.

¶ 71      Although the Eighth Circuit majority purported to take the affidavits as reliable, it failed to assume that the jury would *believe* what they asserted over the conflicting evidence of guilt. As Justice Stevens pointed out, the Eighth Circuit majority was really saying, in so many words, that Schlup's new evidence may have helped him raise a reasonable doubt about his guilt, but did not fully exonerate him, because the State still presented evidence that, if believed, was sufficient to convict him. *Schlup*, 513 U.S. at 331. That analysis confused the actual-innocence standard with the reasonable-doubt standard. *Id.* at 330-31; see *Jackson v. Virginia*, 443 U.S. 307 (1979). On the actual-innocence standard, the question is whether the petitioner has presented evidence that, if believed, would suffice to show his innocence. And if the petitioner *has* presented sufficient evidence of innocence, in this sense, it is immaterial that the State had also presented sufficient evidence of guilt—since we presume, for purposes of this inquiry, that the jury will believe the new evidence of innocence. *Schlup*, 513 U.S. at 331.

¶ 72      The majority here makes the same mistake when it finds that "Niles's affidavit merely conflicts with the testimony of the State's witnesses" and other inculpatory evidence, and thus that defendant's arguments "essentially challenge the sufficiency of evidence," but do not totally vindicate or exonerate him. But there can be no doubt that Niles's affidavit, *if believed*, would

exonerate defendant: Niles, the admitted shooter, attests that defendant was not present for, and had no hand in committing or assisting, his crimes.

¶ 73    So Niles's affidavit does not "*merely* conflict with" the inculpatory trial evidence—if Niles is telling the truth, as we presume at this stage, his affidavit *overcomes* the inculpatory trial evidence.

¶ 74    All newly discovered exculpatory evidence will "conflict" with the evidence that led to a defendant's conviction.  If a "mere conflict" between the evidence of innocence and the evidence of guilt is not enough, such that a mere contradiction between the old and the new evidence can derail an actual-innocence petition, then no newly discovered evidence would *ever* be enough. Our post-conviction proceedings for actual-innocence claims would be a meaningless exercise. The conflict between Niles's exculpatory testimony and the inculpatory evidence offered at trial is not a reason to reject defendant's innocence claim—it is a reason to give that claim a fair and complete airing.

¶ 75    When all was said and done in the *Schlup* proceedings, it was the dissenting judge in the Eighth Circuit whose views prevailed in the Supreme Court. Because the affiants swore, on personal knowledge, that Schlup did not commit the murder, and was not even present at the scene, the dissent concluded that "if [a jury] were to credit the new evidence, it would have no choice but to acquit." *Schlup*, 11 F.3d at 749 n.8 (Heaney, J., dissenting); see *Schlup*, 513 U.S. at 331. Thus, the new affidavits "would satisfy the actual innocence standard"—provided, that is, that their claims "were to stand up in an evidentiary hearing," which the dissenting judge would have granted. *Schlup*, 11 F.3d at 751 (Heaney, J., dissenting).

¶ 76    My view exactly—of *Schlup*, and of this case, too. Simply summarized, my position is consistent with that of the dissenting appellate judge in *Schlup* whose views prevailed in the high

court on the question of how to initially construe a claim of actual innocence: Ask whether the new affidavit testimony would more likely than not exonerate the defendant *if a factfinder believed it*, and if the answer is yes, advance the cause to an evidentiary hearing. At that third stage in Illinois, the trial court hears from the affiant and makes its own independent judgment of whether that testimony is worthy of belief, taking into account all the tools the court typically employs in determining credibility, including the conflicting evidence of guilt from the original trial.

¶ 77    The majority's analysis, in contrast, makes that credibility prediction *for* the third-stage judge. It does *not* assume that a factfinder would believe the substance of the affiant's testimony; it merely lumps in that new testimony with the previous trial testimony and determines, at the first stage, that a factfinder would more likely than not reject that new evidence and embrace the old. That approach, in my view, is premature and is not faithful to the notion that we take the newly proffered evidence as true and forgo credibility determinations at the pleading stage.

¶ 78                                    II

¶ 79    The majority also rejects Niles's affidavit for two more reasons. First, Niles does not explicitly state that he would testify at a retrial. There is no basis for imposing this formalistic requirement on the affidavit of an incarcerated and unrepresented affiant. It should be enough that Niles signed his affidavit under penalty of perjury.

¶ 80    Second, the majority says that Niles's affidavit "does not exonerate defendant," because Niles "does not unequivocally state that he and King robbed Irving's apartment and murdered her or that defendant committed no crimes related to the murder of Irving."

¶ 81    But that *is* what Niles says: Defendant was not with him when he (and King) robbed and murdered Irving, and defendant did not participate in these crimes in any way. True, defendant

did help Niles sell some of the proceeds after the robbery. But even if defendant knew how Niles had acquired those items, he still would not be accountable for any of the crimes that Niles and King had committed without him.

¶ 82     To be accountable, defendant had to intentionally help Niles and King plan or commit their crimes "*either before or during* the commission of the offense[s]." (Emphasis added.) 720 ILCS 5/5-2(c) (West 2016). But Niles says that defendant did not assist him in any way until *after* Niles and King had robbed and murdered Irving. If that is true, defendant cannot be held accountable for their crimes; "at best," he might be an accessory after the fact. 1 John F. Decker, Illinois Criminal Law: A Survey of Crimes and Defenses 172 (4th ed. 2006); see *People v. Dennis*, 181 Ill. 2d 87, 104 (1998) (one who "forms the intent to facilitate an escape only after [the offense] has occurred" may be accessory after the fact, but not accountable for underlying crime); *People v. Taylor*, 186 Ill. 2d 439, 448 (1999) (same).

¶ 83     Thus, if Niles's affidavit is true, defendant is not accountable for the crimes committed by Niles and King, and he certainly cannot be guilty on a theory of direct liability if he was not even present when those crimes were committed. In short, Niles's affidavit, taken as true, fully exonerates defendant.

¶ 84     There is an elephant in the room that complicates this issue: defendant's confession. He confessed to participating in the home invasion and armed robbery that led to Niles's murder of Irving. And that is surely a principal reason why the majority finds that a reasonable juror probably would not believe Niles. A defendant's confession, after all, "is the most powerful piece of evidence the State can offer, and its effect on a jury is incalculable." *People v. Simpson*, 2015 IL 116512, ¶ 36. But these are considerations for the evidentiary stage, not the leave-to-file

stage. Whatever weight defendant's confession may ultimately deserve, it is not a license to reject Niles's affidavit as *per se* incredible, without so much as a hearing on its possible merits.

¶ 85    However powerful a defendant's confession may be, as a general matter, we cannot just automatically assume, at the initial pleading stage, that it *has* to be true, even though an affiant with personal knowledge of the underlying facts swears, in effect, that it is false. Here, Niles's affidavit, taken as true, clearly implies that defendant falsely confessed.

¶ 86    And defendant's *pro se* petition, liberally construed, at least arguably asserts the same: The police, he says, "g[o]t this petitioner to make a confession, when in fact knowing he had no confession to give." Indeed, since the very start of this case, beginning with his pre-trial motion to suppress statements, defendant has consistently alleged that his confession was physically coerced and thus involuntary. (Not to mention his allegations that it was elicited by means of an end-run around *Miranda*, in particular, the question-first, warn-later, question-again technique prohibited by *Missouri v. Seibert*, 542 U.S. 600 (2004).)

¶ 87    These constitutional claims are not before us in this appeal, and thus do not provide independent grounds for granting defendant relief. But in these circumstances, defendant at least deserves a chance to have appointed counsel make the argument that Niles's affidavit is worthy of belief—and thus, by implication, that defendant's oft-challenged confession is not.

¶ 88    To be clear, I am *not* saying that a fact-finder would or should believe Niles's new testimony over defendant's confession. But I am not willing to say the opposite, either. Not at this stage, anyway. My point is simply that a fact-finder who believed Niles's testimony could find—indeed, would have to find—that defendant's confession was false and unreliable. A fact-finder will thus have to weigh the credibility of Niles's assertions against the credibility of defendant's confession. And that process requires an evidentiary hearing, so that Niles, the

admitted shooter, can testify about the crimes; and defendant, if he chooses, can testify to any circumstances of his confession that, in conjunction with Niles's testimony, might lead a reasonable fact-finder to conclude that his confession was false. See *Crane v. Kentucky*, 476 U.S. 683, 688 (1986); *People v. Jefferson*, 184 Ill. 2d 486, 498 (1998) (both holding that after confession found voluntary, as threshold legal matter, fact-finder may disregard it as unworthy of belief, given circumstances in which it was made)

¶ 89     Defendant, to be sure, would have an uphill climb at a third-stage hearing. It would be no small task to show that a reasonable juror would likely believe Niles's assertions over defendant's confession. And if he cannot make that showing, after a hearing, defendant will not be entitled to a new trial. I express no view about his prospects for showing that such relief is warranted. But *if* Niles's affidavit is true, defendant is innocent of these crimes, his confession notwithstanding. That is all he needs to show at the initial pleading stage. I would grant leave to file, allow counsel to make the case for believing Niles, and let the chips fall where they may.