2020 IL App (1st) 171760-U

No. 1-17-1760

Order filed September 17, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 00 CR 26626 |
| | ) | |
| JULIAN JONES, | ) | Honorable |
| | ) | Allen F. Murphy, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HALL delivered the judgment of the court.
Presiding Justice Gordon and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Where the affidavits supporting defendant's postconviction claim of actual innocence are not of such conclusive character that they would probably change the result if a new trial were granted, and where defendant's postconviction claim of ineffective assistance of trial counsel was untimely, the circuit court did not err in granting the State's motion to dismiss.

¶ 2    Defendant Julian Jones, who was convicted of first degree murder, appeals from the second-stage dismissal of his petition for relief pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2010)). On appeal, defendant contends that his petition made a

substantial showing of actual innocence where he presented newly discovered evidence that he was not present at the scene of the shooting and was not involved in the victim's murder. Defendant further contends that his petition made a substantial showing that trial counsel was ineffective for interfering with his constitutional right to testify, and that his untimeliness in presenting this claim was not due to his culpable negligence. For the reasons that follow, we affirm.

¶ 3    Defendant's conviction arose from the drive-by shooting death of Tyjuandell Cole on September 24, 2000, in Chicago Heights, Illinois, near the intersection of Wentworth Avenue and 14th Street (also known as Route 30 or Lincoln Highway). At defendant's 2004 jury trial, the State's theory of the case was that Tracy Hale committed the shooting and that defendant was the driver of the vehicle. The defense theory was that the State's eyewitnesses, Marvin Bentley and Willie Starkes,[1] lied to the police in order to "put this" on defendant, whom they were "out to get." Due to the nature of defendant's claims in this appeal, we will set forth the pertinent facts adduced at trial.

¶ 4    Bentley testified that he was a member of the Four Corner Hustlers street gang and had several prior convictions for possession of a controlled substance, violating probation, and disorderly conduct. During the early morning hours of September 22, 2000, his mother's van, which he used to drive, was "burned up" in front of his house in Ford Heights, Illinois. A few hours later, Bentley went to Chicago Heights to look for defendant, whom he had known for about five years. Around 6:45 to 7:30 p.m., Bentley found defendant on Wentworth in a gray Chevrolet

---

[1] In their briefs, the parties give this witness's last name as "Starks." We adopt the spelling recited by Starkes in his testimony.

Impala. Bentley asked defendant to pay for the van, but defendant refused. Bentley punched defendant, who fell to the ground. Bentley returned to Ford Heights.

¶ 5    On September 24, 2000, Bentley and Jamie McCarter went to Chicago Heights to look for defendant. Around 4 or 4:30 p.m., they met Starkes in the 1400 block of 5th Avenue. Starkes removed his jacket, laid it on a table, and started rolling a "blunt." At this point, defendant arrived in a gray Chevrolet Impala. Two other men were in the vehicle, one in the front passenger seat and one in the back seat. Bentley did not know the passengers but described them as "male black[s]."

¶ 6    Defendant and the front-seat passenger exited the vehicle, each holding a "handgun." From about 13 feet away, defendant and the other man shot at Bentley, Starkes, and McCarter. Bentley ducked behind a tow truck and McCarter went underneath the truck. Bentley did not know what Starkes did when the shooting started. During the shooting, the Impala's front-seat passenger yelled, "Y'all not fittin' to be doing that s*** up here, robbing my workers." Bentley heard about nine shots. Afterwards, the front-seat passenger fled, and defendant jumped in the Impala and drove away.

¶ 7    Bentley grabbed a .38-caliber revolver from Starkes's jacket, chased the Impala, and fired six shots at it. Bentley stated that he hit the Impala. He and Starkes then walked to the intersection of Wentworth and 14th to catch a bus to Ford Heights. At the intersection, they met Cole. Bentley entered the corner store for change. When Bentley exited, he, Starkes, and Cole walked "through the intersection." While Bentley had his head down, counting change, Starkes said, "[T]here go [defendant] and them in their car." According to Bentley, three to five minutes had passed since he had seen the Impala on 5th Avenue.

¶ 8    Bentley looked up and saw the Impala stop on the opposite side of Route 30, facing east. Defendant was driving. The "passenger" exited the Impala, "got on top" of the hood with what looked like an assault rifle, and started shooting. Bentley heard 20 to 30 shots. He, Starkes, and Cole ran toward the store. Bentley ran inside. When the shooting stopped, Bentley came outside, threw the revolver in a garbage can on Wentworth, and "me[t] up with" Starkes. As Bentley and Starkes walked through the intersection to the bus stop, Starkes told Bentley that Cole had been shot in the shoulder.

¶ 9    The next day, Bentley went to the police station in Chicago Heights, where he was interviewed by Detective Thomas Rogers. Bentley viewed a photo array and identified defendant as one of the men who shot at him on 5th Avenue and as the driver of the vehicle from which another man shot at him at 14th and Wentworth. On October 5, 2000, Bentley returned to the police station and identified the gray Chevrolet Impala he saw defendant driving on September 22 and 24, 2000. On October 7, 2000, he viewed a lineup and identified defendant.

¶ 10    On cross-examination, Bentley acknowledged that he told detectives he used his own firearm to shoot at defendant and the Impala's passenger. He explained that he lied about whose firearm he used because he "did not want to put Willie Stark[e]s in it." He also explained that the day after the shooting, he visited the hospital and learned that Cole had died. From the hospital, Cole's relatives drove Bentley to the police station.

¶ 11    Starkes, a member of the Four Corner Hustlers with two pending felony cases, testified that just prior to 3:30 p.m. on September 24, 2000, he went to 5th Avenue in Chicago Heights to gather with a group of people that included Bentley and a man named "Buck." Starkes then bought cigars and marijuana nearby. Shortly thereafter, a tan Chevrolet Impala skidded to a stop about 30 feet

away. The driver and a passenger exited, "[c]upping up their hands like they were hiding a gun or something." Starkes testified that he had seen the Impala before, said defendant was its driver, and identified defendant in court.

¶ 12    Defendant told Bentley something to the effect of, "[Y]ou got something to say about your momma's van being burnt." Bentley ran over, grabbed the coat Starkes had been wearing earlier, and removed a .38-caliber revolver. Starkes previously told Bentley that he had the revolver with him. Defendant shouted, "[D]on't run now," and defendant and the Impala's passenger started shooting at Starkes, Bentley, and Buck. Starkes and Buck ducked behind a tow truck. Starkes heard 12 or 13 shots. When defendant and his passenger stopped shooting, Bentley fired at the Impala. Defendant drove off and his passenger ran through an alley.

¶ 13    Following this incident, Starkes and Bentley went to a liquor store on Wentworth. As they exited, they encountered Cole, who asked for change for the bus fare. Starkes did not have any change, but offered to pay Cole's fare. Starkes and Cole began to cross the street, with Bentley behind them. At this point, the Impala, with defendant driving, "pulled right back up by the light," about 35 feet from Starkes. Starkes pointed at the Impala and said to Bentley, "[T]here they go again." The Impala's front-seat passenger exited the vehicle holding what looked like an AK-47 assault rifle and pointed it toward Starkes, Bentley, and Cole. As the passenger fired, Starkes and Cole ran across the street and through a field. Starkes did not know where Bentley went. Starkes heard bullets going over his head and hitting garbage cans and trees.

¶ 14    Starkes and Cole stopped running on the next block. From behind a building, Starkes saw the Impala's passenger firing at the store. When the passenger stopped firing, he entered the Impala, which drove away. Starkes heard about 40 shots in total. Cole announced he had been

shot, lay against a building, and asked Starkes for help. Starkes went to a nearby house and called 911. After the police and an ambulance arrived, Starkes saw Bentley, and the two men returned to Ford Heights.

¶ 15    The next day, Starkes went to the Chicago Heights police department. There, he spoke with a detective and identified defendant in a photo array as "the driver of the car both times." On October 3, 2000, Starkes identified the Impala at the police station and on October 7, 2000, he identified defendant in a lineup.

¶ 16    On cross-examination, Starkes stated that he brought the revolver to Chicago Heights at Bentley's request. When asked whose firearm it was, Starkes answered, "It was all ours," and explained that he might possess it one day and "somebody else" might possess it another day. Starkes agreed that McCarter was with the group on 5th Avenue, but denied that McCarter had a firearm. Starkes estimated that Bentley fired six shots at the Impala. He also stated that after the second shooting, he and Bentley got a ride to Ford Heights, and during the ride, Starkes saw the revolver in Bentley's jacket pocket. Starkes admitted that when he spoke with the detective, he reported that someone else had called 911. Starkes did not answer truthfully because the detective would have asked him why he did not stay on the scene after calling.

¶ 17    The medical examiner who performed Cole's autopsy testified that his cause of death was a gunshot wound to the back and the manner of death was homicide. She recovered a bullet from Cole's arm and a deformed lead fragment from his chest.

¶ 18    Chicago Heights police officer Clinton Warner responded to the scene after receiving a call at 6:21 p.m. He recovered a bullet fragment from the door frame of a grocery store at the northeast corner of Wentworth and Route 30. He also observed a dime-sized hole in the door frame and

several chips on the west wall of the building. Warner recovered five shell casings for an assault rifle like an AK-47 near the southwest corner of Wentworth and Route 30, in a grassy area diagonally across the street from the grocery store.

¶ 19    Illinois State Police investigator Pamela Janecek assumed custody of the items Warner recovered. During her own canvas of the scene, she found two automatic shell casings in a grassy area near Wentworth and Lincoln Highway and four .25-caliber shell casings on the 1400 block of 5th Avenue.

¶ 20    Jeffrey Parise, an expert in firearms identification, testified that the cartridges were .30-caliber, all fired from the same assault rifle, and that the bullet jackets were "approximately .30 caliber." The bullet core recovered from Cole's body was approximately .30-caliber and the metal fragment was unidentifiable.

¶ 21    Chicago Heights police detective Thomas Rogers testified that around 1 a.m. on September 25, 2000, he interviewed Bentley, who identified defendant in a photo array. That same day, Rogers interviewed Starkes, who also identified defendant in a photo array. Both men told Rogers that the vehicle involved was a silver Chevrolet Impala with a bullet hole near the trunk. Bentley and Starkes separately identified defendant in lineups as the driver of the Impala and a shooter.[2] On September 28, 2000, Rogers located the Impala and learned it was registered to defendant's mother. He saw "an apparent bullet hole in the trunk area." Both Bentley and Starkes subsequently identified the vehicle.

---

[2] Rogers testified that Bentley and Starkes identified defendant in the lineups on September 7, 2000. The shooting, however, occurred on September 24, 2000, and Bentley and Starkes both testified they viewed lineups on October 7, 2000.

¶ 22    Rogers interviewed Patrick Usher on October 12, 2000. Usher told him that after the shootings, he took a bag containing firearms from defendant and transferred it to another location. Following this conversation, Rogers contacted the State's Attorney's office to take Usher's written statement.

¶ 23    Assistant State's Attorney (ASA) Terry Reilly testified that he memorialized Usher's statement on October 12, 2000. Usher told ASA Reilly that sometime after 6 p.m. on September 24, 2000, he received a call from an individual named "Breeze," who ordered him to meet defendant. Usher, accompanied by Monroe McMurtry, drove a van to the designated location. When they arrived, defendant was with a man Usher did not know but later learned was Hale. Hale took a black plastic bag from the trunk of defendant's Chevrolet Impala, said it contained firearms, put it in the van, and told Usher to "stash them." Usher drove to a house "at 22nd and Wentworth." As another man, Anthony McMurtry, took the bag into the house, Usher saw the "wooden handle of a long gun" protruding from the bag. Then the bag ripped, and Usher saw what appeared to be a .25-caliber handgun. The next day, Usher saw a man named Curtis Patton take the firearms from the house.

¶ 24    Usher was called to testify regarding his statement but asserted his fifth amendment privilege against self-incrimination. The trial court requested a proffer of Usher's testimony and determined it did not fall within the purview of the fifth amendment. Usher then testified and recanted his entire statement. He maintained that he had no knowledge of the shooting and that Rogers wrote the statement attributed to him and forced him to sign it.

¶ 25    The jury found defendant guilty of first-degree murder and the trial court sentenced him to 30 years in prison.

¶ 26    On direct appeal, defendant contended that: (1) the trial court improperly broadened the first-degree murder charge by tendering a jury instruction on accountability, (2) the State failed to prove him guilty beyond a reasonable doubt, (3) the trial court erred in admitting Usher's statement, and (4) he was denied his right to a fair trial by the State's improper remarks during closing and rebuttal argument. This court affirmed on June 21, 2006. *People v. Jones*, No. 1-04-2417 (2006) (unpublished order under Supreme Court Rule 23). Defendant's petition for leave to appeal to the Illinois Supreme Court was denied on November 29, 2006. Defendant did not file a petition for writ of *certiorari* in the United States Supreme Court.

¶ 27    On January 21, 2010, defendant filed a *pro se* postconviction petition. In the petition and supporting documentation, defendant alleged that on June 30, 2006, he hired attorney Herb Goldberg to represent him in postconviction proceedings. Defendant paid Goldberg a $3500 retainer and another $2000 in January 2007. On July 26, 2007, Goldberg wrote a letter to defendant's mother, stating that "as [he] indicated *** previously," a postconviction claim of ineffective assistance of counsel could only be raised if supported by the record. After reviewing the record, trial counsel's file, and documents provided by defendant's mother, Goldberg concluded trial counsel's decisions about which witnesses to call constituted trial strategy. However, Goldberg stated that because new witnesses had been "revealed," a postconviction claim of actual innocence could be raised and would not be "subject to the 6 month time restraint we had spoken of."

¶ 28    On January 29, 2008, in what defendant alleged was Goldberg's "first and only communication with [defendant] directly," Goldberg sent him a draft of a proposed postconviction

petition titled "Petition for Post Conviction Relief Relief [*sic*] from Judgment 735 ILCS 5/2/-1401 [*sic*] *et al.*"

¶ 29    In an accompanying letter, Goldberg explained that the proposed petition, which he intended to file after securing supporting affidavits, had "taken some time to complete" because the trial file exceeded 1000 pages. Goldberg stated that after reviewing the file and interviewing trial counsel,

> "it became readily apparent that all witnesses that [trial counsel] had knowledge of were properly interviewed and evaluated before deciding who, if anyone, would be called on your behalf at the time of trial. It was concluded that the witnesses that were not called by him were uncooperative upon interview and were properly not called on your behalf at that time."

However, Goldberg stated that he had located four new witnesses, unknown at the time of trial, whose testimony would be a proper subject for postconviction relief. Goldberg further informed defendant that "time constraints for filing a petition" did not apply to claims of actual innocence.

¶ 30    Defendant received Goldberg's letter and proposed petition on February 5, 2008. He then spoke with a prisoner who opined that the proposed petition would be summarily dismissed and advised defendant not to file it. The prisoner also stated he could not prepare a petition for defendant without the trial file. On February 24, 2008, defendant sent Goldberg correspondence instructing him not to file the proposed petition and requesting his entire trial file. On June 30, 2008, defendant sent Goldberg a letter terminating representation.

¶ 31    On July 16, 2008, "due to the inadequate pleading and failure to turn over [defendant's] file," defendant filed a complaint against Goldberg with the Illinois Attorney Registration &

Disciplinary Commission (ARDC), asserting that Goldberg failed to provide reasonable representation. Among other things, defendant alleged that Goldberg's "false assurances resulted in [defendant] missing the filing deadline for his Petition for Post Conviction relief which he was hired to file." Defendant also alleged that he had requested his trial file from Goldberg "over four (4) months" prior, but Goldberg had not returned it.

¶ 32 The ARDC complaint was dismissed on October 31, 2008, after which Goldberg "released" defendant's file. According to defendant, upon receipt of the trial file, the prisoner advising him "diligently worked on preparing [his] Petition, in reading all materials, researching the issues and typing said Petition and all related documents thereto and has worked in excess of 2100 hours to complete all pleadings."

¶ 33 In relevant part, the petition raised two related claims of ineffective assistance of trial counsel. First, defendant claimed trial counsel was ineffective for failing to investigate and present an alibi defense, despite discussing defendant's alibi with him "on a number of occasions." Defendant alleged that he, his mother, and his girlfriend could have testified to his alibi on the day of the shooting. However, trial counsel "refused to allow" defendant to testify and did not call his mother or girlfriend. Defendant attached affidavits from himself, his mother, and his girlfriend averring that on the day of the shooting, which took place at approximately 6:21 p.m., defendant was with his girlfriend from 5:20 to 7 p.m., driving to Champaign, Illinois.

¶ 34 Second, defendant argued trial counsel was ineffective for refusing his repeated requests to testify at trial. According to defendant, on March 19, 2004, the last day of trial, he "once again demanded to testify" and trial counsel "threaten[ed] me if I brought up testifying once more, he would withdraw from the case and not only would my mother lose all the money of his fee, if I

changed counsel at this late stage of the proceedings, I would be convicted for sure." Trial counsel further instructed defendant to tell the court it was his own decision not to testify, ~~or~~ "otherwise he would withdraw from the case and [defendant] would suffer the negative consequences." Defendant believed he had "no choice," and asserted that had trial counsel not threatened, misled, and coerced him, he would have testified. Defendant attached his mother's affidavit, wherein she averred she was present when trial counsel made these threats.

¶ 35 The circuit court docketed defendant's petition and defendant hired a private attorney, Jennifer Blagg, to represent him.

¶ 36 On July 19, 2013, Blagg filed a supplemental postconviction petition that included, as relevant here, a claim of actual innocence based on newly discovered evidence, namely, affidavits from Carmen Blevins, Nichelle McKinley, Starkes, and Hale.[3]

¶ 37 In Blevins's affidavit, dated March 11, 2013, she averred that on the day in question, she and McKinley went to a store at the corner of Wentworth and Lincoln Highway. As they exited the store, "Gun shots started ringing out from everywhere—concrete, sidewalk, bricks .... everywhere. A bullet hit some of the brick right by my head. It was unreal. I didn't know where gunshots were coming from." Blevins "duck[ed] down to take cover." When she looked up, she saw "a little black car" across the street, facing east on Lincoln Highway, "diagonal" from the store. Blevins averred, "There were two guys in the car that I could see. I know the guys' faces, but I don't know their names. *** [T]hey weren't people you wanted to mess with." She further

---

[3] Blagg also attached other materials that are not relevant to resolving the claim on appeal, including affidavits by Usher, Patton, and defendant's mother; a private investigator's notes regarding Usher and another individual, Sonny Stephenson; a police report summarizing an interview of Stephenson; Rogers's police reports regarding interviews with Usher, McCarter, and Starkes; Hale's and McCarter' statements to Rogers; an excerpt of Stephenson's testimony at Hale's trial; and statements to an ASA from Usher, Starkes, Bentley, and an individual named Tremell Cooper.

stated, "Those people in the black car had to be the ones shooting. [Defendant] wasn't anywhere around that I saw." The vehicle sped away and turned south on Wentworth.

¶ 38   Blevins heard that defendant, whom she knew from the neighborhood, had been charged with murder in connection with the shooting. Blevins did not tell the police what she had witnessed and that defendant was not "one of those guys in that car" because "[i]f I told them something that they didn't want to hear, they would have threatened to take my daughter or to arrest me until I said what they wanted." Blevins was also scared of the men in the vehicle and thought there was "no way" defendant would be convicted.

¶ 39   At some point, Blevins learned that defendant had been convicted. A few months before executing her affidavit, Blevins was contacted by defendant's mother. Blevins, who had moved away from the neighborhood and therefore was not "as scared anymore," realized that giving a statement was "the right thing to do." A few weeks later, Blagg asked if she would provide an affidavit. Blevins agreed and told Blagg what she remembered about the shooting.

¶ 40   In January 2013, Blevins and McKinley met Blagg at a restaurant. Blagg presented affidavits, which they reviewed and edited. Blevins "had to remind [McKinley] of a few things," including that they were not on their way to the store when the shooting occurred, but rather, had just left the store. Blevins averred that she would be willing to testify for defendant.

¶ 41   McKinley averred in her March 11, 2013, affidavit that she and Blevins had just left the corner store when "shots rang out all around my head" and "bullets were hitting the bricks of the store." McKinley and Blevins "immediately got down" on the ground and stayed there until the shooting stopped. Afterwards, McKinley looked up and saw a black Chevrolet Cavalier occupied

by two men, slowly turning from 14th Street onto Wentworth. McKinley knew the two men from the neighborhood; neither was defendant. McKinley averred:

> "I didn't actually see anyone shooting, but I know that the boys in that black [C]avalier killed that boy. It was the only logical place that the shooting could have come from. Plus, the car was just sitting there, which wouldn't make sense unless they were the ones shooting. The way they took off, too, made me think that it was them."

¶ 42    McKinley did not contact the police because "[i]n my neighborhood, you just don't do that" and they "could have easily tried to put something on me if I didn't say what they wanted to hear on this case." Additionally, she feared "all those guys involved in the shooting." She heard that defendant had been charged with murder in connection with the shooting but did not think he would be convicted.

¶ 43    At some point, McKinley learned that defendant had been convicted and told defendant's cousin she "saw the shooting." McKinley was contacted by defendant's mother. McKinley did not want to get involved because she "didn't want to go back to those days," but she eventually agreed to provide an affidavit because "the right thing to do is to tell the truth about what I saw." McKinley also told defendant's mother that Blevins was with her during the shooting.

¶ 44    Shortly thereafter, Blagg called McKinley. McKinley told Blagg everything she remembered, including that she and Blevins were on their way to the store when the shooting occurred. McKinley then contacted Blevins, who "reminded" her they had just exited the store when the shooting began. McKinley averred that their memories "of the rest of the events were pretty much the same." In January 2013, McKinley and Blevins met Blagg at a restaurant. McKinley averred that she was willing to testify for defendant.

¶ 45    Starkes averred in his affidavit, dated April 25, 2013, that he lied at both defendant's and Hale's trials and did not see defendant on the day of the shooting. Instead, Starkes averred that the following happened as he, Bentley, and Cole left the corner store:

"8. I remember seeing the guys that later shot at us roll up in a car as we exited the store. I can't remember the car, but it wasn't the Impala that [defendant] drove. I testified that it was, but I was not telling the truth. We were in the middle of the street, crossing the Lincoln Highway to go to the bus stop to catch it to go back to Ford Heights when the shooting started. I testified truthfully when I said that the passenger got out of the car and started shooting an AK47 at us, but the guy wasn't Tracy Hale.

9. I could tell that the guys had been waiting on us. I didn't see them before we went into the store, but we had been feuding with them before. I saw two guys. The driver wasn't [defendant]. There was only one shooter that I saw."

Starkes denied fighting with defendant earlier in the day, although he and defendant had "an incident" about five days earlier regarding the burning of the van.

¶ 46    Starkes further averred that Detective Rogers told him "to say a lot of stuff." According to Starkes, he eventually "went along with" Rogers because Rogers threatened to charge him with Cole's murder. He stated he was now telling the truth "because it's the right thing to do."

¶ 47    Hale averred in his May 23, 2011, affidavit that he never met or saw defendant until they both appeared in court after being charged with Cole's murder. On an unspecified date after Hale's acquittal, he informed defendant he was willing to testify on defendant's behalf. However, he was never contacted by defendant's lawyer.

¶ 48    The State filed a motion to dismiss. Following a hearing on November 10, 2016, the circuit court dismissed the petition. Defendant filed a timely notice of appeal.

¶ 49    In cases not involving the death penalty, the Act provides a three-stage process for adjudicating petitions alleging that a conviction resulted from a constitutional violation. 725 ILCS 5/122-1 *et seq.* (West 2010); *People v. Hodges*, 234 Ill. 2d 1, 9-10 (2009). The instant case involves the second stage, where defendants are represented by counsel and the State may file a motion to dismiss. *Hodges*, 234 Ill. 2d at 10-11. At this stage, all factual allegations that are not positively rebutted by the record are accepted as true. *People v. Hall*, 217 Ill. 2d 324, 334 (2005). The dismissal of a petition is warranted if its allegations, liberally construed in light of the trial record, fail to make a substantial showing of a constitutional violation. *People v. Coleman*, 183 Ill. 2d 366, 382 (1998). In other words, a defendant is entitled to proceed to a third-stage evidentiary hearing on his petition only if the allegations therein, supported by the trial record and affidavits or exhibits, make a substantial showing of a violation of constitutional rights. *Id.* at 381. Our review at the second stage is *de novo*. *Id.* at 388-89. Pursuant to this standard, we review the trial court's judgment, not the reasons given for it. *People v. Jones*, 399 Ill. App. 3d 341, 359 (2010).

¶ 50    Defendant first contends that his petition made a substantial showing of actual innocence where he presented newly discovered evidence that he was neither at the scene of the shooting nor involved in Cole's murder.

¶ 51    A postconviction petitioner may assert a claim of actual innocence where the claim is based on newly discovered evidence. *People v. Ortiz*, 235 Ill. 2d 319, 333 (2009). Such evidence must be newly discovered, material and not cumulative, and of such conclusive character that it would probably change the result on retrial. *Id.*; *People v. Coleman*, 2013 IL 113307, ¶ 84. Evidence is

considered new where it was discovered after trial and could not have been discovered earlier through the exercise of due diligence; material where it is relevant and probative of the petitioner's innocence; noncumulative where it adds to what the jury heard; and conclusive where, when considered along with the trial evidence, it would probably lead to a different result. *Coleman*, 2013 IL 113307, ¶ 96. The conclusiveness of the evidence is the most important element of an actual innocence claim. *People v. Edwards*, 2012 IL 111711, ¶ 40 (citing *People v. Washington*, 171 Ill. 2d 475, 489 (1996)).

¶ 52    In this case, we need not address the parties' arguments regarding whether Blevins's, McKinley's, and Starkes's potential testimony is newly discovered, material, or noncumulative. This is because defendant fails to meet the requirement that the supporting evidence must be so conclusive that, when considered along with the trial evidence, it would probably change the result on retrial. *People v. Sanders*, 2016 IL 118123, ¶ 47; *Coleman*, 2013 IL 113307, ¶¶ 84, 96.

¶ 53    The conclusive-character element requires a petitioner to "present evidence that places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *People v. Robinson*, 2020 IL 123849, ¶¶ 1, 56 (explaining the "conclusive-character element" in case involving denial of leave to file successive postconviction petition). In the context of second-stage proceedings, where petitioners are required to make a substantial showing of actual innocence to avoid dismissal, new evidence does not satisfy the conclusive-character requirement if it merely contradicts the testimony of other occurrence witnesses or merely adds conflicting evidence to the evidence adduced at the trial. *Sanders*, 2016 IL 118123, ¶¶ 37, 52-53; see also *Robinson*, 2020 IL 123849, ¶¶ 57-59 (recognizing that the " 'conflicting evidence' standard"

applied in second-stage proceedings in *Sanders* and in third-stage proceedings in *Coleman* and *Ortiz*).

¶ 54    Here, defendant argues that the information in Blevins's, McKinley's, and Starkes's affidavits is of such conclusive character that it would be reasonably likely to change the outcome upon retrial because it refutes the accounts of events presented at trial. Defendant notes that none of his proposed new witnesses place defendant or his Impala at the scene of the shooting and asserts that all three "would identify the shooter's car as a car other than [defendant's]." Defendant argues that at retrial, Blevins and McKinley would present as two unbiased, neutral observers, as opposed to Bentley and Starkes, who had motive to lie at trial since they were "enemies" of defendant. Moreover, defendant maintains that at retrial, he could present alibi evidence through his own testimony and that of his mother and girlfriend. Thus, according to defendant's argument, the newly discovered evidence, in conjunction with the alibi evidence, would likely change the result on retrial.

¶ 55    The State responds that Blevins's and McKinley's affidavits do not speak to the actual issue of defendant's innocence, and, therefore, are not conclusive. We agree.

¶ 56    A close reading of Blevins's and McKinley's affidavits reveals that neither of them saw who committed the shooting. Blevins stated that gunshots "started ringing out from everywhere" and she "didn't know where [the] gunshots were coming from." She "duck[ed] down" during the shooting. When she looked up, she saw a small black vehicle across the street, occupied by two men. Defendant was not "anywhere around that [she] saw." Blevins conjectured that the two men in the black vehicle, whom she knew by sight but whose names she did not know, "had to be the ones shooting." Similarly, McKinley related that "shots rang out all around [her] head." She

averred that she and Blevins immediately dropped to the ground and stayed down until the shooting stopped. At that point, McKinley looked up and saw a black Cavalier occupied by two men from the neighborhood, neither of whom was defendant. McKinley specified in her affidavit that she "didn't actually see anyone shooting," but surmised that the black Cavalier "was the only logical place that the shooting could have come from."

¶ 57    As explained above, the conclusive-character element requires a petitioner to "present evidence that places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Robinson*, 2020 IL 123849, ¶ 56. Here, where neither Blevins nor McKinley saw anyone shooting, their proposed testimony fails to place the trial evidence in a different light. Their conclusion that the black vehicle was the source of the gunshots is completely speculative. Moreover, while Blevins stated she did not see defendant "anywhere around" after the shooting stopped, neither she nor McKinley have offered testimony that would discount defendant's presence at the scene while they were "duck[ed] down" on the ground. As such, their proposed testimony does not undermine our confidence in the judgment of guilt.

¶ 58    Starkes's affidavit presents different considerations. At trial, Starkes implicated defendant in Cole's death. Now, he has recanted that testimony and claims defendant was not involved. Specifically, Starkes averred in his affidavit that the shooter fired from a vehicle that was not defendant's Impala and that the driver and passenger of that vehicle were two men—not defendant—with whom Starkes had been "feuding" prior to the shooting.

¶ 59    Our analysis is guided by our supreme court's decision in *Sanders*. There, the defendant was convicted of first degree murder and aggravated kidnaping based, primarily, on the testimony of three witnesses: Donald Barfield, William Ramseur, and Gary Bingham. *Sanders*, 2016 IL

118123, ¶¶ 1, 4-12. Barfield testified that the defendant was one of three men who held the victim by the arms and tried to remove him from Barfield's house. *Id.* ¶ 5. Ramseur testified that three armed men he did not know took the victim from Barfield's house and later identified the defendant in a lineup. *Id.* ¶¶ 6, 9. Bingham testified that he and the defendant, both of whom were armed, dragged the victim from Barfield's house and put him in the trunk of a vehicle. *Id.* ¶ 8. According to Bingham, the defendant directed another man, Aaron May, to drive the group to an abandoned building. *Id.* While Bingham and May waited outside, the defendant removed the victim from the trunk, took him into an abandoned building, and shot him twice. *Id.* A pathologist testified that the victim was shot twice in the head and the cause of death was multiple gunshot wounds. *Id.* ¶ 4. The defendant testified, denying all involvement, and the defendant's girlfriend testified as to an alibi. *Id.* ¶ 52.

¶ 60    The defendant eventually filed a successive postconviction petition asserting newly discovered evidence of actual innocence. *Id.* ¶ 14. The petition was supported by, *inter alia*, an affidavit from Patricia DeRamus and excerpts of testimony that Bingham had given three years earlier at an evidentiary hearing on a postconviction petition filed by codefendant May. *Id.* DeRamus averred that Bingham "march[ed]" the victim from Barfield's house at gunpoint, and that at all times that she observed, Bingham acted alone. *Id.* ¶ 15. In the excerpted testimony, Bingham recanted his testimony identifying May and the defendant as participating in the murder. *Id.* ¶ 16. He stated that he picked up the victim by himself, threw him over his shoulder, carried him outside, and put him in the trunk. *Id.* Alone, he then drove to an abandoned building and shot the victim one time. *Id.*

¶ 61    The circuit court advanced the petition to second-stage proceedings. *Id.* ¶¶ 17-18. The State filed a motion to dismiss, which the circuit court granted. *Id.* ¶ 19. This court affirmed. *Id.* ¶ 20.

¶ 62    Our supreme court affirmed the dismissal, finding that the defendant failed to make a substantial showing of a claim of actual innocence. *Id.* ¶ 55. The court stated that even assuming Bingham's recantation and DeRamus's affidavit were newly discovered, material, and noncumulative, the evidence was not of such conclusive character that it would probably change the result on retrial. *Id.* ¶ 47. Bingham's recantation "conflict[ed] with much of the evidence" at the defendant's trial. *Id.* ¶ 48. For instance, the pathologist had testified that the victim was shot twice, while Bingham stated in his recantation that he shot the victim only once. *Id.* In addition, Ramseur testified that three armed men, one of whom he later identified as the defendant, took the victim from Barfield's house, and Barfield's testimony placed the defendant at the house during the lead-up to the incident and identified the defendant as one of the men involved in taking the victim from the house. *Id.* ¶¶ 48-49, 51.

¶ 63    The *Sanders* court concluded:

> "Thus, Bingham's recantation is contrary not only to his own testimony at petitioner's trial, but also to the testimony of Ramseur and Barfield, who positively identified petitioner as being with Bingham and May at Barfield's house the night of the murder and as having participated in the events leading up to Cooks'[s] murder. It is also contradicted by the pathologist's testimony that Cooks was shot twice in the head, not once, as Bingham claimed in his recantation. Bingham's recantation testimony merely adds conflicting evidence to the evidence adduced at the trial. Even taking the well-pleaded facts

as true, we conclude that the recantation is not of such conclusive character as would probably change the result on retrial.

The same must be said of the factual statements in DeRamus's affidavit. Her statements merely contradict the testimony of other occurrence witnesses. Further, we note that DeRamus's statement that Bingham 'marched' Cooks out the back door of Barfield's house directly contradicts Bingham's recantation testimony when he said that he picked up Cooks, threw him over his shoulder, and took him out the back door. Like Bingham's recantation, DeRamus's proposed testimony would merely add to the evidence the jury heard at petitioner's trial. It is not so conclusive in character as would probably change the result on retrial, either by itself or in conjunction with Bingham's recantation." *Id*. ¶¶ 52-53.

¶ 64    Following *Sanders*, we must determine whether the proposed new evidence would merely add conflicting or contrary evidence to the evidence heard at trial, even where, as in *Sanders*, the postconviction evidence includes statements that the defendant was not involved in the crime. *People v. Simms*, 2020 IL App (1st) 161067, ¶ 43 (citing *Sanders*, 2016 IL 118123, ¶ 48).

¶ 65    Here, Starkes averred that he did not see defendant on the day of the shooting and that he saw the passenger of a vehicle, which was not defendant's Impala, exit, and shoot an AK-47 at him, Bentley, and Cole. As in *Sanders*, this recantation conflicts with evidence at defendant's trial, beyond Starkes's own trial testimony. Bentley testified that defendant pulled up in his Impala, after which the passenger shot at Bentley, Starkes, and Cole with what looked like an assault rifle. Bentley also testified to an encounter with defendant earlier in the day, in which defendant and another man shot at Bentley, Starkes, and McCarter, and Bentley then shot at and hit the Impala

as it drove away. Detective Rogers located defendant's Impala and found that it had an apparent bullet hole in the trunk area, which aligned with Bentley's testimony. Further corroborating defendant's involvement in the incident, Usher gave a statement indicating that after the shooting, he saw the "wooden handle of a long gun" protruding from a bag that had been taken from the trunk of defendant's Impala. We further note that neither defendant's postconviction petition or any of the affidavits accompanying his petition contradict or explain the presence of the bullet holes in the Impala which corroborates evidence presented at defendant's trial. In light of the evidence adduced at trial, Starkes's recantation affidavit, at best, "might 'provide a basis to argue the existence of a reasonable doubt,' but that is not the standard for a claim of actual innocence." *Id.* ¶ 44 (quoting *People v. Anderson*, 401 Ill. App. 3d 134, 141 (2010)).

¶ 66    Starkes's affidavit is not of such conclusive character as would probably change the result on retrial. Rather, the affidavit "merely adds conflicting evidence to the evidence adduced at the trial" and "merely contradict[s] the testimony of other occurrence witnesses." *Sanders*, 2016 IL 118123, ¶¶ 52-53; see also *Simms*, 2020 IL App (1st) 161067, ¶ 47. Thus, defendant has failed to carry his burden to make a substantial showing of a claim of actual innocence. *Sanders*, 2016 IL 118123, ¶ 55; *Simms*, 2020 IL App (1st) 161067, ¶ 47. Second-stage dismissal of defendant's actual innocence claim was proper.

¶ 67    Defendant next contends that his petition made a substantial showing that trial counsel was ineffective for interfering with his constitutional right to testify, and that his untimeliness in presenting this claim was not due to his culpable negligence.

¶ 68    We first address the issue of timeliness. Other than claims of actual innocence, postconviction claims are subject to the statutory deadlines set forth in the Act. *People v. Evans*,

2017 IL App (1st) 143268, ¶ 24. Relevant here, after defendant's conviction was affirmed on direct appeal, his petition for leave to appeal to the Illinois Supreme Court was denied on November 29, 2006. From that date, he had 90 days to file a petition for a writ of *certiorari* to the United States Supreme Court (U.S. Sup. Ct. R. 13 (eff. May 2, 2005)) and an additional six months to commence postconviction proceedings (725 ILCS 5/122-1(c) (West 2006)), that is, until August 27, 2007. See *Evans*, 2017 IL App (1st) 143268, ¶ 25. However, defendant did not file his *pro se* postconviction petition until January 21, 2010, almost two and a half years late.

¶ 69    Nevertheless, we may consider defendant's claim of ineffective assistance of counsel if he shows his late filing was not due to his culpable negligence. 725 ILCS 5/122-1(c) (West 2010). Culpable negligence is "something greater than ordinary negligence and is akin to recklessness." *People v. Boclair*, 202 Ill. 2d 89, 108 (2002). To show a lack of culpable negligence, a defendant must allege specific facts showing why his tardiness should be excused. *Evans*, 2017 IL App (1st) 143268, ¶ 26.

¶ 70    Defendant argues that the documentation attached to his petition demonstrates his late filing was not due to his culpable negligence. He notes that he hired Goldberg to represent him on June 30, 2006; that on July 26, 2007, a month before the petition was due, Goldberg informed his mother that only an actual innocence claim could be raised and that the statutory filing deadline therefore did not apply; and that on January 29, 2008, after the filing deadline had passed, Goldberg sent him a draft petition. Defendant asserts that after he received the draft on February 5, 2008, he discussed it with another prisoner, learned it was "sorely inadequate," and "quickly" fired Goldberg on June 30, 2008.

¶ 71     Defendant argues that he was entitled to rely on Goldberg's advice that the only meritorious claim he could raise in a postconviction petition was an actual innocence claim and that, therefore, no filing deadline applied. He maintains he was unaware he had to take any *pro se* action regarding his petition until after the deadline had already passed, and asserts he acted with diligence in filing his *pro se* petition after he fired Goldberg. He argues that despite first requesting his records from Goldberg on January 30, 2008, he did not receive them until after October 31, 2008, at which point the other prisoner began working on a petition, a process that took more than 2100 hours and culminated with the filing of the petition on January 21, 2010. Defendant concludes:

> "It is evident from [defendant's] petition and attached affidavits, that [defendant] was not sitting on his hands doing nothing after firing postconviction counsel. Rather, [defendant] was working furiously to obtain his records, amassing hundreds of pages of affidavits and records, and getting the petition prepared and typed. [Defendant's] quick action of preparing and filing his postconviction petition does not indicate culpable negligence on his part."

¶ 72     The State responds that Goldberg's letter to defendant's mother demonstrates defendant had knowledge of the filing deadline one month beforehand, and that Goldberg would not be pursuing any ineffective assistance claims. At that point, according to the State, defendant should have fired Goldberg and filed his own timely *pro se* petition raising his claim of ineffective assistance of counsel. The State asserts that where defendant was aware before August 2007 that Goldberg would not file a timely petition that included an ineffectiveness claim, defendant's inaction constitutes culpable negligence. The State maintains that defendant could have drafted the petition without his record, given that he stated in an affidavit attached to his *pro se* petition that

that the citations in the petition were based not on the record, but on "other pleadings, Briefs and Court orders," and because his current claim that trial counsel "interfer[ed] with his right to testify to his own innocence" did not require the trial record, only his own averments.

¶ 73    We agree with the State that defendant has failed to demonstrate his delay was not due to his culpable negligence. "[W]hether delay is due to culpable negligence depends not only on when the claim is discovered but on how promptly the defendant takes action after the discovery." *People v. Davis*, 351 Ill. App. 3d 215, 218 (2004). Here, defendant knew at least a month prior to the filing deadline that his attorney was not planning to include a claim of ineffective assistance of counsel in a postconviction petition. Defendant would not have needed access to any records at that point to raise the claim of ineffectiveness at issue in this appeal—that trial counsel was ineffective for interfering with his right to testify. But even accepting that defendant would not have been culpably negligent until he received his records, it appears from defendant's various filings that he received them in November 2008. Defendant did not file his petition until January 21, 2010. We cannot agree with defendant that this timeframe constitutes "quick action." Accordingly, the trial court did not err in dismissing defendant's postconviction petition as untimely.

¶ 74    We also agree with the State that *People v. Rissley*, 206 Ill. 2d 403 (2003), which defendant cites for the proposition that he was entitled to rely on Goldberg's "legal advice that no filing deadline applied because the only meritorious claim he could raise was an actual innocence claim," is distinguishable. In *Rissley*, the defendant contended his untimely filing was not due to his culpable negligence because he relied, in good faith, on the erroneous advice of his attorney on direct appeal that he had three years from the date of his sentencing to file a postconviction petition. *Id.* at 417-18. Our supreme court agreed, finding that "under the circumstances of this case," the

defendant was not culpably negligent because he remained in constant contact with his direct appeal counsel, prepared his petition "in what he had every reason to believe was a timely manner," and filed the petition "in *advance*" of the date by which counsel had informed him it must be filed. (Emphasis in original.) *Id.* at 421.

¶ 75 Here, in contrast, Goldberg did not misadvise defendant regarding the timeframe for filing postconviction claims. The July 2007 letter from Goldberg to defendant's mother references "the 6 month time restraint we had spoken of" for postconviction claims other than assertions of actual innocence. As such, the record indicates that Goldberg had, at some point, accurately stated the filing deadline. In addition, unlike the defendant in *Rissley*, here, defendant did not file his petition in advance of the deadline counsel had stated. Where *Rissley* hinged on the circumstances of that case, we find it does not direct our determination here.

¶ 76 Culpable negligence aside, however, defendant's underlying claim of ineffectiveness would fail on its merits. Defendant contends that he made a substantial showing that counsel was ineffective for interfering with his constitutional right to testify. He asserts that trial counsel refused to allow him to testify and threatened that if defendant asserted his right to do so before the trial court, he would withdraw from the case, defendant would be convicted and "suffer negative consequences," and defendant's mother would "lose all the money" she paid. Defendant asserts that he believed he had no choice but to follow counsel's directions, but if counsel had not threatened and coerced him, he would have testified to his alibi.

¶ 77 Claims of ineffective assistance are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient, and that the deficient

performance prejudiced the defendant. *Strickland*, 466 U.S. at 687. Where postconviction allegations of ineffectiveness are contradicted or rebutted by the record, dismissal prior to an evidentiary hearing is proper. *Coleman*, 183 Ill. 2d 382; *People v. Palmer*, 2017 IL App (4th) 150020, ¶ 23.

¶ 78    Here, the record reflects that after the State rested, the trial court engaged in the following colloquy with trial counsel and defendant:

"THE COURT: Does the defense anticipate calling the defendant, Mr. Julian Jones, as a witness in this matter?

[DEFENSE COUNSEL]: No.

THE COURT: Mr. Jones, your attorney has indicated to me that—you have a right, an absolute right to remain silent and to not testify in this matter. He has informed me that you wish to utilize that right and not testify; is that correct?

[DEFENDANT]: Yes.

THE COURT: You do have a right to testify, do you understand also?

[DEFENDANT]: Yes.

THE COURT: You have discussed this matter with your attorney, and based on that discussion with your attorney it is your decision; is that correct?

[DEFENDANT]: Yes.

THE COURT: Has anybody forced you or threatened you or made any promises to you to reach that decision?

[DEFENDANT]: No.

THE COURT: Okay, Mr. Jones, if you wish and your attorney wishes, I will instruct the jury about your right not to testify, and the jury will not take that into account. I will order the jury not to take that into account whether you testified or not. There will be an instruction given on that. Do you understand that, sir?

[DEFENDANT]: Yes, sir.

THE COURT: All right. Thank you."

¶ 79    This exchange reveals that defendant's underlying claim of being denied his right to testify is refuted by his own words. *People v. Greer*, 212 Ill. 2d 192, 211 (2004). The trial court admonished defendant regarding his right to testify and specifically asked him if anyone had forced, threatened, or made any promises to him to make him reach a decision regarding that right. Defendant affirmatively stated he had not and that the decision not to testify was his. The record shows that defendant had ample opportunity to inform the trial court that he wished to testify or that counsel was preventing him from doing so, but did neither. Thus, defendant's claim is rebutted by the record. See *People v. Rogers*, 197 Ill. 2d 216, 222 (2001); *People v. Knapp*, 2019 IL App (2d) 160162, ¶ 41, *appeal allowed*, No. 124992 (Sept. 25, 2019) (where the defendant made no mention of any pressure from counsel throughout the trial court's admonitions, the record positively rebutted his claim that counsel refused to allow him to testify). Because defendant's allegation that trial counsel provided ineffective assistance by interfering with his right to testify is positively rebutted by the record, dismissal of defendant's postconviction claim on its merits would be proper. See *People v. Palmer*, 2017 IL App (4th) 150020, ¶ 23; see also *People v. Cleveland*, 2012 IL App (1st) 101631, ¶¶ 66-67 (where the defendant took no steps to invoke his

right to testify during his trial, his claim that counsel prevented him from testifying failed to warrant a third-stage evidentiary hearing).

¶ 80    For the reasons explained above, we affirm the judgment of the circuit court.

¶ 81    Affirmed.